No. 108,607

KANSAS BUILDING INDUSTRY WORKERS COMPENSATION FUND,
   *et al.*, *Appellants*, v. STATE OF KANSAS and KENT OLSON,
   DIRECTOR OF DIVISION OF ACCOUNTS AND REPORTS,
   DEPARTMENT OF ADMINISTRATION, *Appellees*.

(359 P.3d 33)

Opinion filed August 28, 2015.

*Michael R. O'Neal*, of Gilliland & Hayes, P.A., of Hutchinson, argued the cause, and *Shannon L. Holmberg*, of the same firm, was with him on the briefs for appellants.

*Derenda J. Mitchell*, assistant attorney general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the briefs for appellees.

The opinion of the court was delivered by

JOHNSON, J.: Plaintiffs, who were required to pay fees to a State agency in order to practice their trade or transact business in Kansas, brought suit against the State of Kansas and Kent Olson, Director of Division of Accounts and Reports in the Department of Administration. The action challenged a 2009 appropriations bill, Senate Substitute for House Bill No. 2373, which directed the transfer of moneys into the State General Fund (SGF) from the various State agency fee fund accounts into which the respective plaintiffs had paid fees. The plaintiffs argued that the legislature's sweep of large sums of money from the fee-funded accounts into the SGF was an invalid exercise of the State's police powers and an unconstitutional exercise of its taxing authority.

The district court dismissed the lawsuit, finding that plaintiffs did not have standing to sue, because the moneys were taken from the agencies, not from the individuals that paid fees into the agencies' accounts. Further, the district court opined that the plaintiffs' complaints were required to be addressed under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq*.

Plaintiffs appealed and the Court of Appeals reversed the order of dismissal, finding that plaintiffs had standing because they had been uniquely damaged by the transfer of funds and that the plaintiffs were not required to bring their claims under the KJRA because the agencies had no authority under the KJRA to grant the relief sought by plaintiffs, which was a finding that the legislation directing the fee fund transfers was unconstitutional.

The defendants petitioned this court for review, raising several issues. Initially, this court only granted review of the standing issue. Subsequently, we requested additional briefing on whether plain-

tiffs' claims involved a political question and, if so, whether that deprived the judiciary of jurisdiction. We resolve both the standing and political question issues in plaintiffs' favor and remand to the district court to reinstate the action.

## FACTUAL AND PROCEDURAL OVERVIEW

In the district court, the litigation was terminated early upon a motion to dismiss. Accordingly, we look to the plaintiffs' amended petition for the salient facts. *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 751, 189 P.3d 494 (2008) (when district court grants motion to dismiss based on lack of standing, appellate court must accept facts alleged by plaintiff as true, along with any inferences that can reasonably be drawn therefrom); *cf. McCormick v. Board of Shawnee County Comm'rs*, 272 Kan. 627, 634, 35 P.3d 815 (2001) (review of district court's grant of motion to dismiss for failure to state a claim requires appellate court to assume the facts alleged by the plaintiffs and reasonably drawn inferences are true).

### Background of H.B. 2373

In 2009, the Governor informed the legislature of an anticipated total revenue gap between expenditures and available resources for fiscal year 2010 of over $900 million. Ostensibly, in order to make up for this revenue gap, the Governor recommended transferring $29 million in Special Revenue Fund balances into the SGF in fiscal year 2009 and another $2.2 million in fiscal year 2010. The Governor's published recommended budget contained an itemized listing of the proposed revenue transfers, which were characterized as "cash sweeps." The listing included proposed transfers from the Workers Compensation Fund administered by the Kansas Insurance Department (WC Fund), the Real Estate Fee Fund administered by the Kansas Real Estate Commission (RE Fund), and the Bank Commission Fee Fund administered by the Office of the State Bank Commissioner (Bank Fund).

Using the Governor's proposed budget, the 2009 Kansas Legislature passed Senate Substitute for House Bill 2373 (H.B. 2373). Senate floor amendments reduced the total amount of transfers by

21.5 percent and granted outright exemptions to several fee funds originally included within the Governor's itemized listing of proposed revenue transfers. Ultimately, H.B. 2373 passed and was signed into law, effective June 11, 2009. The final version of H.B. 2373 authorized and directed the Director of Accounts and Reports to transfer a total of $2.355 million from the WC Fund account to the SGF, a total of $195,671 in RE Fee Funds to the SGF, and a total of $534,517 in the Bank Fund to the SGF. The legislation stated that the purpose of the transfers was to reimburse the SGF for accounting, auditing, budgeting, legal, payroll, personnel and purchasing services, and any other governmental services performed on behalf of the affected agencies by other state agencies which receive appropriations from the SGF to provide such services.

*Workers Compensation Fee Fund*

Most Kansas employers are required to provide workers compensation coverage for their employees. An employer may self-insure or obtain an insurance policy from a State authorized insurance carrier or group-funded workers compensation pool. These insurers are also required, by statute, to fund the operations of the WC Fund, which is administered by the Kansas Commissioner of Insurance and is liable for specific statutorily authorized workers compensation awards, as well as payment of the actual expenses of the Insurance Commissioner that are incurred in administering the WC Fund.

On June 1 of each year, the Commissioner of Insurance may impose an assessment against the insurers in order to assure payment of compensation under the Workers Compensation Act (the Act). The Act details how the assessment amount for each insurer is computed, but the total amount of the assessment "shall be equal to an amount sufficient, in the opinion of the commissioner of insurance, to pay all amounts, including attorney fees and costs, which may be required to be paid from such fund during the current fiscal year." K.S.A. 2014 Supp. 44-566a(b)(1). The assessments are received by the Commissioner and remitted to the State Trea-

surer, who deposits them in the State Treasury to the credit of the WC Fund.

In June 2009, the Kansas Insurance Department informed insurers that the legislature's 2009 fund sweep required that the Department impose a 1 percent assessment for fiscal year 2010. Subsequently, in June 2010 and June 2011, the Department sent out additional notices indicating that because the legislature continued to sweep money from the WC Fund, the Department would again have to assess additional fees to the insurers. The Department represented that "but for" the $2.355 million sweep from the WC Fund, no assessment would have been required in fiscal years 2010 and 2011. At oral argument, plaintiffs alleged that the WC Fund receives no services from any other state agency that receives appropriations from the SGF to provide such services to the WC Fund.

*Real Estate Fee Fund*

All persons desiring to operate as a licensed real estate agent or broker in Kansas are required to pay licensing fees to the Kansas Real Estate Commission every 2 years. The license fees are ultimately deposited in the State Treasury, and at the time of the actions giving rise to this lawsuit, 20 percent of the deposits were credited to the SGF for administration costs, but the remainder was credited to the RE Fund. Plaintiffs alleged, and the State admitted, that the transferred amount of $195,671 from the RE Fund was derived from the Kansas Savings Incentive Program (KSIP), a State program that allowed participating agencies to keep half of any savings realized by their agency during the prior fiscal year to spend on employee bonuses, technology purchases, and professional development.

*Bank Commissioner Fee Fund*

The Kansas State Bank Commissioner is statutorily authorized to make assessments on all banks, savings and loan associations, and trust companies (hereinafter "banks") in order to pay for all costs and expenses associated with administering the banking, saving and loan, and trust laws in Kansas. The Bank Commissioner remits the collected assessments to the State Treasurer, who de-

posits the money in the State Treasury. Pursuant to the law in existence at the time of the 2009 transfer, 20 percent of the deposit must be credited to the SGF, with the balance credited to the Bank Fund. In other words, normally the State takes $1 out of every $5 of fees that the banks pay into the Bank Fund, ostensibly to cover the costs incurred by other, tax-funded agencies that support the operations of the Bank Fund. The transferred amount of $534,517 from the Bank Fund—which was in addition to the usual upfront 20 percent service fee—was derived from KSIP.

### District Court Proceedings

In January 2010, plaintiffs brought suit against the State of Kansas, Department of Administration, Division of Accounts and Reports. Plaintiffs were subsequently granted leave to file an amended petition naming the State of Kansas and Kent Olson, Director of Accounts and Reports, Department of Administration, as defendants in the case. Plaintiffs were comprised of: (1) Insurers who provide workers compensation insurance and are required to pay assessments into the WC Fund (Insurer plaintiffs); (2) the Kansas Association of Realtors, which is comprised of real estate agents and brokers who must pay licensure fees every 2 years to the RE Fund (Realtor plaintiffs); and (3) two supervised lenders, together with the Kansas Bankers Association, a trade association made up of lenders, all of which are required to pay licensure fees and assessments to the Bank Fund (Banker plaintiffs). Another group of plaintiffs who were required to pay into a Conservation Fee Fund in connection with oil and gas operations had their fee funds swept into the SGF, but that group is no longer participating in this lawsuit.

Plaintiffs alleged that the sweep of the respective fee funds constituted a general revenue-raising measure and not a valid exercise of police power authority because the transferred amounts of money exceeded the reasonable and necessary costs of regulation and administration. Plaintiffs sought: (1) a declaratory judgment ruling that the cash sweeps were unconstitutional; (2) injunctive relief barring further or future legislative-enacted transfers of the fee funds; (3) mandamus or quo warranto relief against Kent Olson,

seeking restoration or reimbursement of the swept funds; and (4) class certification.

Defendants filed a motion to dismiss, arguing, *inter alia*, that the court did not have subject matter jurisdiction because plaintiffs lacked standing to bring their claims. Specifically, defendants claimed that plaintiffs had no standing to seek enforcement of a public right, namely the appropriation of public funds.

Plaintiffs responded, claiming that they had standing pursuant to the reasoning found in *Sac and Fox Nation v. La Faver*, 31 F. Supp. 2d 1298 (D. Kan. 1998), and *Watson v. City of Topeka*, 194 Kan. 585, 400 P.2d 689 (1965). Plaintiffs further argued that while they did not challenge the statutory authority of an agency to assess and collect fees for the legitimate purposes authorized in enabling legislation, they did challenge "the diversion of fee funds by the state into the State's General fund coffers and expended for purposes not authorized or contemplated by the enabling legislation allowing the collection of fees by regulatory agencies." In other words, the plaintiffs objected to their fees—which were assessed for a specifically authorized purpose—being appropriated and used by the State for public purposes as if they were general tax moneys.

The district court framed the motion to dismiss issue as:

"Assuming Plaintiffs' claims to be true, that is, the fees and charges now being imposed are due to the shortfall in funds available to a respective agency because of the various transfers noted and 'but for' they would not have been imposed as they are, the questions before the Court devolve into the question of a remedy and the standing to assert it."

The district court first determined that a challenge to the agencies' fee decisions must be brought under the KJRA. The district court reasoned that, even assuming that the transfers were unlawful, defendants' actions did not harm plaintiffs, but rather it was the agencies' responses to the transfers that caused plaintiffs' injuries. For example, the district court surmised, had the agencies cut back on expenses in response to the fund transfer, rather than increasing fees, plaintiffs would not have brought this action because they would have suffered no injury.

The district court then concluded that plaintiffs' only remedy under the KJRA would be a determination that the additional fee

assessment was unlawful but that the KJRA did not provide a means for restoring funds that had already been used somewhere else. The district court noted that the KJRA did not contain a procedure to add other parties, such as the Director of Accounts and Reports or State Treasurer who would be necessary to reverse the transfers. Accordingly, the district court determined that the agencies would be required to reimburse plaintiffs from their own funds, which, in turn, would require the agencies to reduce their services and render them unable to perform their statutory duties. The district court concluded that the agencies' presumed inability to perform statutory duties constituted an issue of public concern, thereby undermining plaintiffs' standing to bring the action. Finally, the district court found that the Attorney General and district attorneys are charged with bringing an action that affects the general public. The district court therefore ruled that plaintiffs had until September 9, 2011, to either (1) "secure the substitution of the Attorney General of the State of Kansas or his special designee" to prosecute the case; or (2) pursue individual claims under the KJRA. The district court further ruled that if neither action was taken, it would dismiss the lawsuit for lack of subject matter jurisdiction.

Plaintiffs failed to exercise either option but instead sought to add the affected agencies as indispensable parties to the action. The district court denied this request and consequently dismissed the case for lack of subject matter jurisdiction. Plaintiffs filed a timely appeal.

*Appellate Proceedings*

Plaintiffs complained on appeal that the district court misconstrued their arguments, especially with regard to their prayer for a declaratory judgment, which led to the improper dismissal. The Court of Appeals agreed with plaintiffs that the district court had terminated their lawsuit prematurely, summarizing its holding as follows:

"We reverse and remand this case because the district court erred when it ruled the Plaintiffs had no standing to bring this action. They indeed appear to be uniquely damaged by the legislative enactment in a way that the general public is

not—they had to pay increased fees. Thus, this lawsuit was not one that had to be brought by the attorney general or a county or district attorney. Also, the Plaintiffs were not required to bring a case under the Kansas Judicial Review Act because the state agencies cannot give the primary relief the Plaintiffs seek—the declaration that H.B. 2373 is unconstitutional.

"Because the district court dismissed this action solely upon the grounds of standing and the Plaintiffs' failure to pursue a remedy under the Judicial Review Act, we will not address questions that the district court has had no opportunity to answer first. These questions include: whether the district court properly denied class certification; whether the defendants are immune from suit; whether this is a political question; or whether the Plaintiffs can seek mandamus or quo warranto relief. The district court must address those issues on remand. We do not know how this controversy will end, but we do know it can begin." *Kansas Bldg. Industry Work. Comp. Fund v. State,* 49 Kan. App. 2d 354, 356, 310 P.3d 404 (2013).

The State filed a petition requesting that this court review the panel's published decision. The petition set forth the following issues:

"1. Whether the Defendants are immune from suit in this matter.

"2. Whether the Plaintiffs may avoid the Constitutional requirement that the legislature be the sole branch that appropriates moneys, avoid the presumption of constitutionality, and ask the courts to ignore the plain language of the legislative journals to allow them to assume irregularity in the legislative process.

"3. Whether the courts have jurisdiction to decide Plaintiffs' case.

"4. Whether Plaintiffs may bypass the exclusivity of the Kansas Judicial Review Act.

"5. Whether Plaintiffs may bring claims of mandamus and quo warranto when Plaintiffs have alleged no failure to perform an unfulfilled duty."

The State's petition for review was only granted in part. Specifically, the court's order and the clerk's notice of action to the parties stated that the petition was "granted only as to Issue 3, regarding standing." After supplemental briefing and oral arguments to this court, we determined that additional briefing was required on the correct test for standing to be applied in Kansas state courts. But additionally, a question arose as to whether the political question doctrine is jurisdictional or prudential. See *Hegab v. Long,* 716 F.3d 790, 800 n.4 (4th Cir. 2013) (quoting Chemerinsky, *Federal Jurisdiction* 45 [5th ed. 2007], for the proposition that the Supreme Court has not announced whether the political question doctrine

is constitutional and thus jurisdictional). An appellate court can make a *sua sponte* inquiry into whether it has jurisdiction over a question presented to it on appeal. See *State v. Berreth*, 294 Kan. 98, 117, 273 P.3d 752 (2012) ("appellate courts have a duty to question jurisdiction on their own initiative").

Consequently, this court requested additional briefing that addressed the following questions:

"1. With respect to the standing issue:

"a. How should the test for standing be stated in this case?

"b. Is the test for standing applied differently with respect to plaintiffs' prayer for declaratory judgment?

"2. Whether this case involves a non-justiciable political question, including an analysis of the following questions:

"a. Is the money in the plaintiffs' respective funds 'public moneys'?

"b. Is the money in the Kansas Savings Incentive Program (KSIP) 'public moneys'?"

We take the liberty of first considering the political question doctrine of nonjusticiability, before discussing the standing issue. Ultimately, we affirm the Court of Appeals and remand to the district court to reinstate the proceedings.

## POLITICAL QUESTION DOCTRINE

In the district court, the State claimed an absence of subject matter jurisdiction because the plaintiffs' claims raised a purely political question, *i.e.*, the political question doctrine rendered the plaintiffs' claims nonjusticiable. Essentially, the State argued that budgeting is a political matter, the legislature's intent for the stated purpose of the appropriation may not be questioned, and the court may not depose members of the legislature and inquire into their motives and beliefs for passing the legislation. The State reasoned: "A court may not step into the shoes of a legislator and second-guess the need to reimburse the state and make appropriations."

### Standard of Review

"Whether a claim is nonjusticiable is a question of law. See *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 903, 249 P.3d 434 (2011); *cf. Van Sickle v. Shanahan*, 212 Kan. 426, 439, 511 P.2d 223 (1973); see also *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell*, 295 Conn. 240, 254-55, 990 A.2d 206 (2010) ('Because an issue regarding justiciability raises a question of law, our

appellate review is plenary.'); *Nebraska Coalition for Ed. Equity v. Heineman*, 273 Neb. 531, 540, 731 N.W.2d 164 (2007)." *Gannon v. State*, 298 Kan. 1107, 1118-19, 319 P.3d 1196 (2014).

## Analysis

The seminal United States Supreme Court case on the political question doctrine is *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). There, certain Tennessee voters sued under the civil rights statute seeking to declare a state apportionment statute unconstitutional on equal protection grounds. The federal district court dismissed the action as nonjusticiable under the political question doctrine. The Supreme Court reversed, finding the allegations that a state statute effected an apportionment that deprived plaintiffs of equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution presented a justiciable constitutional cause of action which was within the reach of judicial protection, *i.e.*, the case did not present a nonjusticiable political question. 369 U.S. at 237.

Enroute to that decision, *Baker* extensively explored the political question doctrine and reviewed many cases "in order to expose the attributes of the doctrine—attributes which, in various settings, diverge, combine, appear, and disappear in seeming disorderliness." 369 U.S. at 210. The Court opined:

"The nonjusticiability of a political question is primarily a function of the separation of powers. Much confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution. To demonstrate this requires no less than to analyze representative cases and to infer from them the analytical threads that make up the political question doctrine. We shall then show that none of those threads catches this case." 369 U.S. at 210-11.

From its review of prior cases, the Court synthesized the elements of the political question doctrine, which it described as follows:

"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although

each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

"Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing." 369 U.S. at 217.

The Court also cautioned that, as a tool for maintenance of governmental order, the political question doctrine "will not be so applied as to promote only disorder." 369 U.S. at 215. *Baker* ultimately found it " ' "inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence" '" by the political question doctrine. 369 U.S. at 230 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 344-45, 81 S. Ct. 125, 5 L. Ed. 2d 110 [1960]).

Recently, in *Gannon*, this court referred to the enumerated portion of the above *Baker* quote as "the six *Baker v. Carr* factors" and clarified that one or more of the factors must exist to give rise to a political question. 298 Kan. at 1137. *Gannon* further noted "that this court has previously applied the *Baker v. Carr* factors, sometimes concluding an issue was a nonjusticiable political question (*Leek [v. Theis]*, 217 Kan. [784,] 813-16[, 539 P.2d 304 (1975)]) and sometimes concluding it was not (*Van Sickle*, 212 Kan. at 438-39)." 298 Kan. at 1138. Accordingly, we will continue to view the political question doctrine through *Baker*'s lens.

Pursuant to *Baker*, it seems that the first step is to make a "discriminating inquiry into the precise facts and posture of [this] par-

ticular case." 369 U.S. at 217. As noted, the posture of this case is a dismissal on jurisdictional grounds. As the Court of Appeals aptly noted, the current appeal is not about which party will win in the end, but rather it concerns whether the lawsuit may begin. *Kansas Bldg.*, 49 Kan. App. 2d at 356. Accordingly, the State's arguments concerning the presumption of constitutionality afforded to legislative enactments are premature; if the lawsuit is a nullity, there will be nothing to construe.

Likewise, the State's contentions that budgeting is a political process and that the payment of government expenses is constitutionally committed to the legislative branch are not in issue here. The plaintiffs do not dispute the legislature's power to appropriate public money over which the State has exclusive control. Rather, in their words, "[w]hat [p]laintiffs challenge is the diversion of fee funds by the state into the State's General Fund coffers and expenditures for purposes not authorized or contemplated by the enabling legislation which allows the collection of fees by regulatory agencies." The State responds that all money in the State Treasury is public money; that the fees collected for the agency funds involved in this case are deposited to the State Treasury; and, therefore, the fee funds are public money subject to appropriation at the sole discretion of the legislature. Accordingly, the character of the moneys in issue is a critical fact to resolve.

The State's conclusory assertion that all moneys in the State Treasury are public money subject to unfettered appropriation is not universally embraced.

American Jurisprudence provides:

"Appropriations can be made only from state funds which are those funds raised by the operation of some general law. To be subject to the appropriation power of the legislature, funds held by state officers or agencies must belong to the state. Funds held in trust to be distributed according to legislatively prescribed conditions are not subject to appropriation, even though they are received on account of the state and the state treasurer is designated custodian." 63C Am. Jur. 2d Public Funds § 28.

Similarly, Corpus Juris Secundum provides:

"All public funds and revenue coming into the state treasury, not specifically authorized by the constitution or by statute to be placed in a separate fund, and

not given or paid over in trust for a particular purpose, constitute a part of the general fund of the state. The general fund is the collective designation of all the assets of the state which furnish the means for the support of the government and the defraying of the discretionary appropriations of the legislature, that is, the necessary and contingent expenses of the government. . . .

"The payment of funds into the state treasury does not necessarily vest the state with title to those funds. The term general funds refers to funds belonging to the state and does not apply to funds for the benefit of contributors for which the state is a mere custodian or conduit." 81A C.J.S., States §§ 383, 384 (2004).

Especially with respect to workers compensation funds, a majority of other jurisdictions considering the issue have found that those funds do not constitute public moneys subject to appropriation by the legislature. For instance, in *Moran v. State ex rel. Derryberry*, 534 P.2d 1282 (Okla. 1975), an action was brought by policyholders of the Oklahoma State Insurance Fund seeking to enjoin statutorily directed liquidation of certain assets of the Fund and the legislative appropriation of those funds. The action was prompted by the passage of a law to provide for disposition and use of " 'existing surplus funds of the State Insurance Funds in excess of the reserves and surplus authorized to be maintained at law.' " 534 P.2d at 1284 (quoting 85 O. S. Supp. 1974 § 152). Included in the legislation was authorization for the State Insurance Fund commissioner to liquidate assets of the Workmen's Compensation Fund in the amount of $4 million dollars, which was subsequently appropriated to the State Board of Education for the support of the public school activities. 534 P.2d at 1284.

As in this case, the State of Oklahoma claimed that the fee funds involved in that case were state moneys subject to appropriation. The Oklahoma Supreme Court rejected the State's position as being the minority view. The *Derryberry* court reviewed various treatises, to-wit:

"In Appleman, Insurance Law and Practice, Vol. 7A, § 4592, p. 190, 'State Insurance Funds' it is stated:

'The purpose of a compensation act is to provide compensation for workmen injured in occupations defined by the act, and the funds created by the act, together with the revenues by which they are sustained, are trust funds devoted to the special purposes designated by the act.'

And at page 192, as follows:

'The fund, itself, is not synonymous with the state, and claims against the fund are not claims against the state, the fund not being considered a state fund.'

"Also in Appleman, Vol. 7A, § 4594, pages 202, 203, 'State Insurance Funds-Payment Out of Funds' it is stated:

'The Industrial Accident Board, Compensation Commission, or whatever department stands in that stead, occupies a position of trust in relation to every person who is entitled to receive benefits from the funds, of which the Board is made trustee. The revenues received from the contributions of employers are a trust fund in the sense that a moral and legal obligation is imposed upon the state to use the revenues for the declared purposes for which they are collected.'

"In 100 C.J.S. Workmen's Compensation § 357b, page 40, relative to State Funds, we find the following:

'. . . The fund is a public fund in the sense of being administered by a public body, and its character as a public fund is indicated by a statute providing that industrial insurance premiums shall be paid into the state treasury for the accident and medical aid funds; but it is not public money in the sense of being money of the state to be used for, and on behalf of, the state for a state expenditure.' " 534 P.2d at 1286-87.

Ultimately, the Oklahoma Supreme Court concluded that

"the funds of the State Insurance Fund are not State funds and do not belong to the State, that such funds are trust funds for the benefit of employers and employees, and are not available for the general or other purposes of the State, nor are they subject to appropriation by the Legislature for purposes other than those contemplated by the State Insurance Fund Act." 534 P.2d at 1288.

Accord *State v. Musgrave*, 84 Idaho 77, 84, 370 P.2d 778 (1962) ("The money in the fund does not belong to the state . . . ."); *Senske v. Fairmont & Waseca Canning Co.*, 232 Minn. 350, 356, 45 N.W.2d 640 (1951) ("It is a fund which belongs to industry, in which the state has no interest other than its proper administration."); *State v. McMillan*, 36 Nev. 383, 388, 136 P. 108 (1913) (premiums could not be used or made available for payment of ordinary expenses of state government); *State v. Padgett*, 54 N.D. 211, 217, 209 N.W. 388 (1926) ("The claims against the fund are not claims against the state; and the fund itself is not a state fund."); *State v. Olson*, 43 N.D. 619, 625, 175 N.W. 714 (1919) ("not a state fund"); *Chez, Atty. Gen. v. Industrial Comm. of Utah*, 90 Utah 447, 452, 62 P.2d 549 (1936) (holding that while state workers compensation fund was "a public fund in the sense of being ad-

ministered by a public body, [it was] not public money in the sense that it is money of the state to be used for and on behalf of the state for a state expenditure"); *State v. Yelle*, 174 Wash. 547, 550, 25 P.2d 569 (1933) (holding that funds within a workers' compensation accident fund were "trust funds drawn from particular sources and devoted to special purposes. . . . These funds are therefore not subject to appropriation by the legislature for purposes other than those contemplated by the act, nor by methods that run counter to the effective operation of the act."). But *cf. Industrial Com'n of Arizona v. Brewer*, 231 Ariz. 46, 51-52, 290 P.3d 439 (2012) (rejecting idea that moneys held in workers compensation special fund were held in trust for benefits of employers and employees and instead determining they were public moneys that could be transferred by the Arizona Legislature to the general fund).

The majority view with regard to workers compensation funds comports with this court's assessment of the purposes of Kansas' WC Fund. One of those purposes is to encourage the employment of handicapped persons by relieving employers of workers compensation liability; another purpose is to pay benefits to injured workers where the employer has no insurance and is financially unable to pay, or where the employer cannot be located to pay workers compensation. See *Wasson v. United Dominion Industries*, 266 Kan. 1012, 1019, 974 P.2d 578 (1999).

Likewise, while all of the funds involved in this litigation are deposited into the State Treasury, the portion of the paid-in fees remaining after any automatic service fee assessment by the State is credited to a separate account for the respective fund. Then, expenditures from a fund account are limited to those purposes for which the fund was statutorily created. For instance, money in the Bank Fund cannot be used to build a bridge or to pay the Governor's salary. In that vein, K.S.A. 75-3036 contemplates that fee funds designated for a specific purpose are not part of the SGF and are not "public moneys." That statute provides:

"The state general fund is exclusively defined as the fund into which shall be placed all public moneys and revenue coming into the state treasury not specifically authorized by the constitution or by statute to be placed in a separate fund,

and not given or paid over to *the state treasurer in trust for a particular purpose*, which unallocated public moneys and revenue shall constitute the general fund of the state; but moneys received or to be used under constitutional or statutory provisions or under the terms of a gift or payment for a particular and specific purpose are to be kept as separate funds and shall not be placed in *the general fund or ever become a part of it, except by proper statutory enactment*, and any such moneys which are wrongfully or by mistake placed in the general fund shall constitute a proper charge against such general fund: *Provided*, That all legislative appropriations which do not designate a specific fund from which they are to be paid shall be considered to be proper charges against the general fund of the state: *Provided further*, That all revenues received by the state of Kansas or any department, board, commission, or institution of the state of Kansas, and required to be paid into the state treasury shall be placed in and become a part of the state general fund, except as provided in this act." (Emphasis added.)

In short, we reject the State's assertion that all moneys in the State Treasury are public moneys over which the State has unfettered, general appropriation powers. Here, the fee funds were composed of payments for a particular and specific purpose and, accordingly, they were to be kept as separate funds and not as part of the general fund. Consequently, the State's attempt to fit within the *Baker v. Carr* factors with conclusory declarations that budgetary matters are political falls within *Baker's* rejection of "semantic cataloguing." 369 U.S. at 217.

The State's more colorable argument is that, specific to these funds, the legislature determined that the transfers were to "reimburse the state general fund for accounting, auditing, budgeting, legal, payroll, personnel and purchasing services, and any other governmental services which are performed on behalf of the state agency by other state agencies which receive appropriations from the state general fund to provide such services." Journal of the Kansas Senate for May 5, 2009, p. 803. The State contends that such a legislative declaration is nonjusticiable. We disagree.

Although the Court of Appeals initially said that it would not consider the political question issue, it nevertheless found that the question presented was justiciable. The panel said:

"Our Supreme Court has held that the State may only reimburse itself for the legitimate costs of regulation and supervision (*i.e.*, what is reasonable and necessary) through legislative transfers from fee funds to the State General Fund. See *Panhandle Eastern Pipe Line Co. v. Fadely*, 183 Kan. 803, 806-07, 332 P.2d

568 (1958). We follow the lead of the Supreme Court and consider this to be a question of the propriety of an exercise of police powers of the State and is thus a justiciable controversy." *Kansas Bldg. Industry Work. Comp. Fund v. State*, 49 Kan. App. 2d 354, 369-70, 310 P.3d 404 (2013).

*Panhandle Eastern Pipe Line Co. v. Fadely*, 183 Kan. 803, 332 P.2d 568 (1958) involved a circumstance similar to the facts of this case. Panhandle paid assessments into the Natural Gas Conservation fund (NGC Fund), which was administered by the State Corporation Commission (KCC) to pay the expenses of the agency's Conservation Division. The KCC determined that the NGC Fund had sufficient moneys to pay its expenses and reduced its assessments. Shortly thereafter, the legislature passed two bills: One directed the transfer of $100,000 from the NGC Fund to the SGF, and the other directed the State Treasurer to credit the SGF with 20 percent of all NGC fees collected by the KCC. After the $100,000 fee fund transfer, the KCC restored its former assessment order. Panhandle brought suit to challenge the constitutionality of the enactments.

Panhandle argued that the legislatively ordered transfer of NGC Fund moneys to the SGF was a revenue-raising measure that took its property without due process and violated the taxing provisions in Article 11, §§ 1 and 5 of the Kansas Constitution. Further, it contended that charging 20 percent of the fee assessments for the SGF violated the Commerce Clause and Fourteenth Amendment to the United States Constitution.

The State answered that the transfer and the 20 percent exaction merely covered indirect expenses incurred by the KCC and paid by the State from the SGF. It argued that neither the Kansas Constitution nor the United States Constitution prohibited the State from receiving "reasonable recompense for the assistance in regulation and supervision rendered by other departments." 183 Kan. at 806.

The district court found the legislation unconstitutional, and the Supreme Court affirmed, stating, *inter alia*:

"[I]t is clear that under its police power the state may reimburse itself for the costs of otherwise valid regulation and supervision by charging the necessary expenses to the businesses or persons regulated. [Citations omitted.] A statute, how-

ever, is void if it shows on its face that some part of the exaction is to be used for a purpose other than the legitimate one of supervision and regulation [citation omitted], *or if more than adequate remuneration is secured* [citations omitted]." (Emphasis added.) 183 Kan. at 806-07.

"When a regulatory measure openly becomes a revenue enactment, that portion thereof which exacts revenue fails as a valid exercise of the police power. We are of the opinion that [the bills at issue] amount to a tax and a revenue measure levied under the guise of a regulatory fee, and violate article 11, section 1 of our state constitution, the commerce clause and the Fourteenth Amendment of the Federal constitution." 183 Kan. at 808.

Granted, the legislation reviewed in *Panhandle* did not include a legislative expression that the transfer was intended as a reimbursement of costs. But nevertheless, the overarching point for our purposes is that the question of whether the legislature has failed to validly exercise its police power is a justiciable question. As the Court of Appeals pointed out, even a Kansas Attorney General's opinion suggests that courts need to analyze whether cost assessments are reasonable in relation to the actual costs of regulation, *i.e.*, the question of whether the legislature has exceeded its police power authority is justiciable. Att'y Gen. Op. No. 2002-45, at *5 recites:

"If an assessment is determined to so exceed the cost of regulation that it is apparent the Legislature is using it as a general revenue raising measure, the overage cannot stand on police power authority. If the assessment is in fact a revenue raising measure, it must be analyzed as such, which may include a determination as to whether it meets Commerce Clause and Equal Protection requirements, as well as any state constitutional requirements applicable to the type of tax that it is."

Moreover, a review of the *Baker v. Carr* factors shows the inapplicability of the political question doctrine. The State has not shown a textually demonstrable constitutional commitment of the unfettered exercise of the State's police power to the legislature. Courts often are called upon to determine whether the amount charged for expenses was reasonably necessary, so that judicially discoverable and manageable standards exist to resolve the question. The question does not require an initial policy determination of a kind clearly for nonjudicial discretion, but rather the resolution is a matter of accounting. In undertaking an independent resolu-

tion to the question presented—whether the legislature overstated the amount required to be reimbursed—it will not be necessary to express a lack of respect for the legislative branch. The State has not revealed an unusual need for unquestioning adherence to a political decision already made, especially in light of the plaintiffs' request for a declaratory judgment to protect their future assessed fees from being swept. Finally, the potentiality of embarrassment from multifarious pronouncements by various departments on one question is not evident in this case. *Baker*, 369 U.S. at 217.

Having determined that this case does not present a nonjusticiable political question, we move on to the issue of standing.

### STANDING

Utilizing the federal test for standing, the State argues that plaintiffs do not have standing because they: (1) fail to show an interest not possessed by all citizens who pay fees and taxes; (2) fail to show that their claimed injury was caused by defendants; and (3) fail to show how the defendants can redress the claimed injury. On the other hand, plaintiffs claim that they meet the requirements for standing as articulated in Kansas caselaw, *i.e.*, they "have been uniquely damaged by [H.B. 2373] in a way that is entirely different from any harm experienced by members of the general public." As noted, we gave the parties an opportunity to submit supplemental briefing on which standing test that we should employ in this case, which we will discuss below.

### *Standard of Review*

"The existence of jurisdiction and standing are both questions of law over which an appellate court's scope of review is unlimited." *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1121, 307 P.3d 1255 (2013). When a district court grants a motion to dismiss based on a lack of standing, the appellate court accepts the facts alleged in the petition as true, and if those facts demonstrate that the appellants have standing to sue, the decision of the district court must be reversed. See *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 751, 189 P.3d 494 (2008).

The State agrees that a de novo standard of review is generally employed when determining standing. But it then makes the curious argument that we must "dismiss this case forthwith on the basis that the question the Plaintiffs ask the Court to review is beyond the proper standard of review." The State points to *Harris v. Shanahan*, 192 Kan. 183, 194, 387 P.2d 771 (1963), for the proposition that all doubts as to the constitutionality of legislation are construed in favor of validity. The State then suggests that the presumption of validity is a standard of review which requires this court to decline to review the constitutionality of presumably valid legislation.

The State's circular argument is apparently the product of melding the concepts of a standard of review, a canon or rule of statutory construction, and jurisdiction or justiciability. A standard of review denotes "[t]he criterion by which an appellate court exercising appellate jurisdiction measures the constitutionality of a statute or the propriety of an order, finding, or judgment by a lower court." Black's Law Dictionary 1441 (8th ed. 2004). The presumption of constitutionality is not a standard of review but a canon of statutory construction. See *Kansas One-Call System v. State*, 294 Kan. 220, 225, 274 P.3d 625 (2012). Jurisdiction encompasses "the court's statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998). Therefore, the presumption of constitutionality has no relevance to whether this court has authority or jurisdiction to adjudicate a case or controversy, nor does it define the scope of review or deference afforded the trial court. Moreover, as noted above, the presumption has no impact on determining the nonjusticiability of a political question.

Clearly, courts have the power to determine whether a statute is unconstitutional. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 138, 2 L. Ed. 60 (1803); *State v. Cheeks*, 298 Kan. 1, 11, 310 P.3d 346 (2013) (It is the legislature's prerogative to make policy decisions, but the court is tasked with ensuring those decisions are within the parameters of the constitution.). This power applies to statutes dealing with legislative appropriations. *Gannon v. State*, 298 Kan. 1107, 1181, 319 P.3d 1196 (2014) ("the legislature's with-

holding of all capital outlay equalization payments since fiscal year 2010 renders the operation of 72-8814[c] unconstitutional— whether done by appropriations bill or the provisions of the statute itself"). However, this power only arises when the question is presented in an actual case or controversy between parties. *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 888, 179 P.3d 366 (2008). Standing is a requirement for a case or controversy. *Gannon*, 298 Kan. at 1122. Standing is also a component of subject matter jurisdiction. 298 Kan. at 1122. As a jurisdictional matter, standing requires the court to decide whether a party has alleged a sufficient personal stake in the outcome of the controversy to invoke jurisdiction and to justify the court exercising its remedial powers on the party's behalf. *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 903, 249 P.3d 434 (2011). Thus, although this court has authority to determine whether H.B. 2373 is constitutional, it must first determine whether it has subject matter jurisdiction based on plaintiffs' standing.

*Analysis*

"Standing is 'a party's right to make a legal claim or seek judicial enforcement of a duty or right.' Black's Law Dictionary 1536 (9th ed. 2009)." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 324, 255 P.3d 1186 (2011). "While standing is a requirement for case-or-controversy, *i.e.*, justiciability, it is also a component of subject matter jurisdiction that may be raised at any time." *Gannon*, 298 Kan. at 1122. "A justiciable controversy has definite and concrete issues between the parties and 'adverse legal interests that are immediate, real, and amenable to conclusive relief.' *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 890-91, 179 P.3d 366 2008)." *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012).

Kansas' standing requirement is grounded in the separation of powers doctrine which is implicit in our State Constitution. *Morrison*, 285 Kan. at 896. "Under the traditional test for standing in Kansas, ' "a person must demonstrate that [1] he or she suffered a cognizable injury and [2] that there is a causal connection between the injury and the challenged conduct." ' " *Gannon*, 298 Kan. at

1123 (quoting *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 908-09, 249 P.3d 434 [2011]). This traditional standing test has been utilized repeatedly by the Kansas Supreme Court. See *Sierra Club v. Moser*, 298 Kan. 22, 33, 310 P.3d 360 (2013); *Friends of Bethany Place, Inc.*, 297 Kan. at 1126; *Board of Miami County Comm'rs*, 292 Kan. at 324; *Cochran*, 291 Kan. at 908; *Bremby*, 286 Kan. at 761; *Lower v. Board of Dir. of Haskell County Cemetery Dist.*, 274 Kan. 735, 747, 56 P.3d 235 (2002).

The Court of Appeals initially referred to the two-part Kansas test. But in discussing the impact of the federal case, *Sac and Fox Nation of Missouri v. Pierce*, 213 F.3d 566 (10th Cir. 2000), the panel also discussed and applied both the constitutional and prudential standing requirements utilized by federal courts. *Kansas Bldg. Industry*, 49 Kan. App. 2d at 367-68. Federal constitutional standing enforces the United States Constitution's case-or-controversy requirement found in Article III. *United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675, 2685, 186 L. Ed. 2d 808 (2013). It requires: (1) that the plaintiff suffered an injury in fact, or a concrete and particularized actual or imminent injury; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Prudential standing, on the other hand, embodies self-imposed judicial restraints on the exercise of jurisdiction. *Windsor*, 133 S. Ct. at 2685-86. The prudential standing principles are: (1) the plaintiff asserts his or her own rights and not those of a third party; (2) the plaintiff's grievance is not a general one shared by a large class of citizens; and (3) the interests which the plaintiff seeks to protect are arguably within the zone of interests protected by statutory or constitutional guarantee. See *Sac and Fox*, 213 F.3d at 573. Prudential standing requirements apply only to the exercise of federal courts' jurisdiction. *The Wilderness Soc. v. Kane County, Utah*, 632 F.3d 1162, 1168 (10th Cir. 2011).

This court has occasionally cited to the federal constitutional standing requirements. See, *e.g.*, *Ternes v. Galichia*, 297 Kan. 918, 921, 305 P.3d 617 (2013). But we have not explicitly abandoned

our traditional state test in favor of the federal model. Moreover, as opposed to the United States Constitution, our State Constitution contains no case or controversy provision. The Kansas Constitution grants "judicial power" exclusively to the courts. Kan. Const. art. 3, § 1. And Kansas courts have repeatedly recognized that "judicial power" is the " 'power to hear, consider and determine controversies between rival litigants.' " *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. 293, 337, 955 P.2d 1136 (1998) (quoting *State, ex rel., v. Mohler*, 98 Kan. 465, 471, 158 P. 408 [1916], *aff'd* 248 U.S. 112, 39 S. Ct. 32, 63 L. Ed. 153 [1918]). Given the differences in the genesis of the two systems, we do not feel compelled to abandon our traditional two-part analysis as the definitive test for standing in our state courts. Nevertheless, we would find, as did the Court of Appeals, that plaintiffs established standing under either test.

*Cognizable Injury*

The Court of Appeals adequately described a cognizable injury that plaintiffs suffered:

"The damage alleged by the Plaintiffs is entirely different from any harm that members of the general public experienced. H.B. 2373 reduced the fee funds that the Plaintiffs paid into, and the Plaintiffs were required to pay increased fees and assessments in order to replenish those funds. That increase in fees was the specific injury suffered by the Plaintiffs. Members of the general public do not pay into the fee funds, and, therefore, they could have suffered no special harm from the fee transfers caused by the enactment of H.B. 2373. In the event that the fee transfers were reversed by a court, any possible harm to the public upon that occurrence would be speculative at this point and would only *oppose* a possible remedy of the Plaintiffs and not deny them the right to sue." 49 Kan. App. 2d at 364-65.

The State advocates for the causation rationale of the district court, *i.e.*, the increased fees were due to the agencies' actions, rather than the legislature's cash sweeps, because the agencies could have chosen to reduce expenses rather than replenish their respective funds through increased assessments. We will discuss the causation aspect of this rationale in the second step, causal connection. But it bears mentioning that, if the agencies had reduced the level of services instead of assessing additional fees, the

plaintiffs might still have presented a cognizable injury because they did not get what they paid for. For instance, a bank contributing to the Bank Fund has an interest in the Bank Commissioner assuring that competing banks are following the same rules under which the contributing bank must operate. If the Bank Commissioner reduces its auditing operations because the State took most of the Bank Fund, the contributing bank has paid for a service that it is not getting.

Before moving to causation, we address the State's complaint aimed specifically at the RE Fund. The State contends that plaintiffs did not allege that the Real Estate Commissioner had actually assessed the payors into that fund for the amounts swept. Nevertheless, the RE Fund plaintiffs are required to make periodic fee payments into the fund which will arguably be used to replenish the swept funds. The fact that the replenishing fees may not have actually been paid at the time of the lawsuit does not foreclose a cognizable injury. Perhaps those plaintiffs will fail in proving their damages when the case proceeds on the merits, but their showing at this early stage forecloses their dismissal.

Moreover, part of the requested relief is a declaratory judgment safeguarding the RE Fund from future cash sweeps. As the sole contributors to the RE Fund, the injury caused by any future sweeps would fall squarely on the RE Fund plaintiffs.

### Causal Connection

In *Gannon*, this court borrowed the federal courts' definition of the requisite causal connection for standing: "[T]he injury must be ' "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." ' *Lujan*, 504 U.S. at 560." 298 Kan. at 1130. Federal courts have clarified that the fairly traceable standard does not set a high bar for plaintiffs:

"Such a nexus is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue. However, while the 'indirectness' of an injury ' "may make it substantially more difficult" ' to show the 'fairly traceable' element of Article III standing, *i.e.*, 'to establish that, in fact, the asserted injury was the consequence of the defendants' actions,' indirectness is 'not necessarily fatal to standing,' . . . because the fairly traceable standard is

lower than that of proximate cause. [Citations omitted.]" *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (finding that terrorist victims had Article III standing to sue bank that provided Iran with U.S. currency because injury was fairly traceable based on reasonable inference that Iran's ability to amass U.S. currency to fund terrorist organizations was increased by bank transfers).

See also *Bennett v. Spear*, 520 U.S. 154, 168-69, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (It is wrong to equate injury " 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."); *Focus on the Family v. Pinellas Suncoast Transit*, 344 F.3d 1263, 1273-74 (11th Cir. 2003) (The standing doctrine does not require proximate causation, it suffices that the injury flow indirectly from the challenged conduct.). "Thus, the fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant." *Rothstein*, 708 F.3d at 92.

Notwithstanding that the fairly traceable standard encompasses injury that flows indirectly from the challenged conduct, the State contends that the plaintiffs' injuries—increased fee assessments— were caused by the nonparty agencies, rather than by the State. It claims that "but for" the agencies' decisions to assess additional fees to replenish the swept funds, the plaintiffs would have suffered no injury.

The Court of Appeals rejected this middleman-as-intervening-cause argument, based in part upon the holding in *Sac and Fox*, 213 F.3d at 573-74. *Kansas Bldg. Industry*, 49 Kan. App. 2d at 368-69. There, Kansas assessed a motor fuel tax on distributors, who sold to retailers on sovereign Native American lands. The distributors passed on the Kansas tax in its pricing to the tribal retailers. The tribal retailers sued Kansas because they were not subject to State taxation. The State unsuccessfully argued that the tribal retailers' injuries were actually caused by the distributors' pricing, rather than by the State's tax on the distributors.

But the Tenth Circuit disagreed, holding that the tribe's economic injury—the distributor's act of passing the cost of the tax along to the retailers—was causally connected to the challenged act of taxing the distributor, giving the tribal retailers standing to

challenge the tax in a lawsuit against the State. 213 F.3d at 573-74; see also *Maryland v. Louisiana*, 451 U.S. 725, 736-37, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981) (finding first-use tax on pipeline was fairly traceable to injury of increased cost of natural gas suffered by consumers); but *cf. Illinois Ass'n of Realtors v. Stermer*, 2014 IL App. (4th) 130079, ¶ 37, 5 N.E.3d 267 (2014) (finding no standing for contributors to swept real estate license fee fund because fee increases may have resulted from other factors such as inflation or increased overhead costs).

Any notion that the increased fee assessments for the WC Fund or the Bank Fund were precipitated by something other than the cash sweeps, *i.e.*, was not fairly traceable to the legislative transfers, is belied by the agencies' notice to their contributors. A June 1, 2010, Kansas Insurance Department notice to insurers stated: " 'This Legislative sweep makes it necessary that the Kansas Insurance Department levy an assessment this year of 1.0%.' " The Bank Commissioner's Notice of Assessment provided, in part,

" 'Over the past several years the Kansas Legislature has made the difficult decision to "sweep" surplus funds from our Agency and others for use in other areas of state government, thereby eliminating that surplus. As a result, our fees must be increased to better reflect the actual cost of regulation and maintain a viable regulatory structure.' "

The RE Fund was in the same position as the other plaintiffs in losing its funds to the SGF because of the legislatively ordered transfers, so that the injury suffered by the fund contributors to replenish the swept funds has to be fairly traceable to those transfers.

Likewise, we reject the district court's suggestion that the agencies caused the plaintiffs' injuries by choosing to replenish their funds with additional assessments, rather than constricting their operations to live within their post-sweep means. The agencies are granted the authority to assess fees for their respective funds for a reason. The agencies are charged with the responsibility to regulate and supervise the particular operations to which the respective funds apply. They are not granted the discretion to cease operations if they run out of money, but rather it is their responsibility to raise the funds necessary to carry out their statutorily mandated

responsibilities. For instance, the Insurance Commissioner cannot refuse to pay covered workers compensation benefits to a claimant simply to reduce the expenditures from the WC Fund.

As an additional standing argument, the State claims that Kent Olson, Director of the Division of Accounts and Reports, Department of Administration, is not a proper party to be a defendant in this action. That is a separate issue which is not properly before the court in this appeal because the propriety of naming Olson is irrelevant to whether plaintiffs have standing to bring their claim.

In short, we find that the plaintiffs have suffered a cognizable injury and that the injury is fairly traceable to the challenged conduct, which is the legislatively ordered transfer of fee funds to the SGF.

*Associational Standing*

Additionally, we note a potential issue of associational standing, given that two of the plaintiffs are trade associations, the Kansas Bankers Association and the Kansas Association of Realtors. Although the parties do not discuss this issue, its impact on our jurisdiction mandates that we do.

An association has standing to sue on behalf of its members when: "(1) the members have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Friends of Bethany Place, Inc.*, 297 Kan. at 1126. Here, a member would have standing to sue individually, but the individual participation of a member is not required to resolve the claim or grant relief. Clearly, the associations seek to protect interests that are germane to their missions of advocating for their respective professions. We find all plaintiffs have standing here.

Accordingly, we affirm the Court of Appeals' reversal of the district court's dismissal of the lawsuit and remand to the district court to reinstate the lawsuit.