NOT DESIGNATED FOR PUBLICATION

No. 121,693

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TRUST WOMEN FOUNDATION INC.,
d/b/a SOUTH WIND WOMEN'S CENTER,
d/b/a TRUST WOMEN WICHITA,
*Appellant*,

v.

MARC BENNETT, District Attorney for Sedgwick County, KATHLEEN SELZLER LIPPERT,
Executive Director of the Kansas Board of Healing Arts, ROBIN D. DURRETT, President
of the Kansas Board of Healing Arts, and DEREK SCHMIDT, Attorney General of Kansas,
*Appellees*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Opinion filed May 20, 2022.
Reversed and remanded with directions.

*Anne M. Kindling*, of Joseph, Hollander & Craft LLC, of Topeka, *Robert V. Eye*, of Robert V.
Eye Law Office, of Lawrence, *Gail M. Deady,* pro hac vice, of Center for Reproductive Rights, of New
York, New York, *Jessica Sklarsky,* pro hac vice, of the same firm, *Kirby Tyrrell*, pro hac vice, of the same
firm, and *Marc A. Hearron,* pro hac vice, of the same firm, of Washington, D.C., for appellant.

*Courtney E. Cyzman*, assistant general counsel, of Kansas State Board of Healing Arts, and
*Tucker L. Poling*, general counsel, of the same agency, for appellees Kathleen Selzler Lippert and Robin
D. Durrett.

*Brant M. Laue*, deputy solicitor general, *Jeffrey A. Chanay*, chief deputy attorney general, *Shon
D. Qualseth*, senior trial counsel, and *Derek Schmidt*, attorney general, for appellees Marc Bennett and
Derek Schmidt.

Before ARNOLD-BURGER, C.J., SCHROEDER, J., and RICHARD B. WALKER, S.J.

1

ARNOLD-BURGER, C.J.:  This lawsuit, brought against Attorney General Derek Schmidt, Sedgwick County District Attorney Marc Bennett, and the President and the Director of the Kansas Board of Healing Arts by a Kansas abortion provider and its patients, challenges the constitutionality of K.S.A. 65-4a10. The statute requires any abortion-inducing drug "be given to the patient by or in the same room and in the physical presence of the physician who prescribed, dispensed or otherwise provided the drug or prescription to the patient." K.S.A. 65-4a10(b)(1)(B). This results in the inability of a legal abortion provider, Trust Women Foundation Inc. (Trust Women), to provide abortion services via telemedicine. As a result, Trust Women requested that the court issue a temporary injunction against enforcement of the statute. It claimed that there was a reasonable probability it would suffer irreparable injury if the statute were to be enforced pending a determination of its constitutionality. The district court denied injunctive relief. It also dismissed Trust Women's action against the Kansas Board of Healing Arts, finding Trust Women lacked standing to sue the Board. Trust Women appeals both rulings.

Because we find that the district court abused its discretion in denying injunctive relief to Trust Women, we reverse and remand this case to the district court to apply the correct legal standard and correct its error of fact. We also find that the district court erred in dismissing the case against the Board of Healing Arts for lack of standing. We reverse that finding and reinstate the action against the Board.

We pause to note that the present action regarding the constitutionality of the statute remains pending in the Shawnee County District Court. Here, the case before us relates only to the issuance of a temporary injunction. But as part of the "procedural backwater" described by the district court in this case, another action challenging the same statute was decided by a different judge in Shawnee County on January 20, 2022. That case, in which a temporary injunction had been in place by agreement of the parties for 10 years, resulted in a finding that K.S.A. 65-4a10 was unconstitutional to the extent

2

it banned telemedicine medication abortions. A notice of appeal has been filed in that case.

## FACTUAL AND PROCEDURAL HISTORY

This case involves the cessation of a pregnancy in the first 10 weeks through a process known as a medication abortion. Medication abortions are administered by oral consumption of two different medications, one in a medical office and one at home— where the abortion is completed. The patient must schedule a follow-up appointment in the clinic 14-21 days after the medication abortion is complete. At the follow-up appointment the patient is given a pregnancy test and a physician has an opportunity to evaluate the patient.

Since 2011, state law has provided that "[w]hen RU-486 (mifepristone) or any drug is used for the purpose of inducing an abortion, the drug must be administered by or in the same room and in the physical presence of the physician who prescribed, dispensed or otherwise provided the drug to the patient." K.S.A. 2011 Supp. 65-4a10(a). Violation of the law constitutes unprofessional conduct under the Kansas Healing Arts Act. K.S.A. 65-4a10(d). This law prevents medication abortions from being accomplished through telemedicine—a common method of medical patient interaction for a virtually limitless list of medical appointments and procedures.

A group of gynecologists challenged the law as unconstitutional a few months after its passage. *Hodes v. Moser*, No. 2011-CV-1298 (*Hodes 2011*). The district court entered a temporary restraining order preventing enforcement of the law until a hearing could be held. Soon thereafter, the parties—the gynecologists, the Secretary of the Kansas Department of Health and Environment, the Attorney General, and the Johnson County District Attorney—entered an agreement (Agreed Order), manifested by an order of the district court, agreeing that the defendants would not seek to enforce the statute or

3

accompanying regulations pending the district court's final judgment. Such an agreement was well within the authority of the Attorney General.

That case remains pending over 10 years later, with little effort to move it to judgment by any party until recently. In January 2022, K.S.A. 65-4a10 was declared unconstitutional by the Shawnee County District Court. The State has filed a notice of appeal. Based on the Agreed Order, abortion providers were able to provide medication abortions by telemedicine unrestricted—with no fear of enforcement—from the date of the Agreed Order to today. The evidence in the current case was that no enforcement action has been taken by the Attorney General, any district or county attorney, the Kansas Department of Health and Environment, or the Board of Healing Arts for the last 10 years against any Kansas abortion provider for providing medication abortion via telemedicine.

*The Legislature adopts the Telemedicine Act, effective January 1, 2019.*

With *Hodes 2011* still pending in the district court, the Legislature enacted the Telemedicine Act which became effective on January 1, 2019. L. 2018, ch. 98, § 1; see K.S.A. 2020 Supp. 40-2,210 et seq. The Act addressed health insurance coverage and information privacy standards for telemedicine care. Section 6 of the Act contained the sole reference to abortion, providing:  "Nothing in the Kansas telemedicine act shall be construed to authorize the delivery of any abortion procedure via telemedicine." L. 2018, ch. 98, § 6; see K.S.A. 2020 Supp. 40-2,215.

*Trust Women files a lawsuit to enjoin enforcement of the Telemedicine Act as unconstitutional.*

Trust Women provides reproductive healthcare, including abortion, HIV/AIDS treatment, transgender care, and family planning services. At the time of the motion hearing, it operated clinics in Wichita, Oklahoma City, and Seattle. It opened its Wichita

clinic in April 2013. It has provided medication abortions at its Wichita clinic since 2013. Trust Women began providing medication abortions via telemedicine in October 2018, after the passage of the Telemedicine Act but before it went into effect.

Trust Women filed a lawsuit in November 2018 against Kansas Attorney General Derek Schmidt, No. 2018-CV-844 (*Trust Women I*). It alleged that Section 6 of the Telemedicine Act was an unconstitutional infringement on abortion access. Trust Women sought a temporary injunction and a temporary restraining order preventing enforcement of Section 6 of the Act, which was scheduled to go into effect January 1, 2019.

The district court dismissed the case on December 31, 2018, ruling that nothing in the Telemedicine Act "contain[ed] an independent prohibition on the provision of abortion through the use of medications nor by telemedicine." In other words, the Act neither allowed medication abortions via telemedicine, nor prohibited them.

The district court also noted the symbiotic relationship between the Telemedicine Act and K.S.A. 65-4a10—which does ban telemedicine medication abortions. The court found that even if the Telemedicine Act could be interpreted as a ban on telemedicine medication abortions, the Agreed Order entered in *Hodes 2011* enjoined Schmidt, as Kansas Attorney General, from enforcing it. This was true even though Trust Women was not a party to *Hodes 2011* because Trust Women was "entitled to enjoy that umbrella of protection and safe harbor provided by the *Agreed Order*."

Explaining this broad interpretation of the Agreed Order in *Hodes 2011*, the district court noted that the attorney general is the chief law enforcement officer of the state. See K.S.A. 75-702 ("The attorney general shall appear for the state, and prosecute and defend any and all actions and proceedings, civil or criminal, in the Kansas supreme court, the Kansas court of appeals and in all federal courts, in which the state shall be interested or a party, and shall, when so appearing, control the state's prosecution or

5

defense."); K.S.A. 75-764 (requiring that the attorney general be given notice and an opportunity to intervene any time a statute is challenged as unconstitutional); Supreme Court Rule 11.01 (2022 Kan. S. Ct. R. at 71) (same); see also *State v. Finch*, 128 Kan. 665, 668-69, 280 P. 910 (1929) ("'[A]s a rule, the attorney-general has power, both under the common law and by statute, to make any disposition of the state's litigation that he deems for its best interest; for instance, he may abandon, discontinue, dismiss, or compromise it.'" [Quoting 2 Thornton on Attorneys at Law, 1160]). So the attorney general can bind county and district attorneys by his agreements in compromise related to the enforcement of state statutes.

The district court went on to note that a violation of K.S.A. 65-4a10 is designated unprofessional conduct as defined by the Kansas Healing Arts Act, K.S.A. 65-2801 et seq. Under the act, it is also a criminal misdemeanor, the prosecution of which is controlled by the attorney general. K.S.A. 65-2862. The district court concluded that the Attorney General is ethically bound to comply with the Agreed Order to enjoin enforcement of K.S.A. 65-4a10 and "any implementing regulations." There is no dispute that the Attorney General has complied with the Agreed Order since its entry.

Finally, citing K.S.A. 77-201 *First*, the district court held that amendments to K.S.A. 65-4a10 adopted in 2015 did not alter the effectiveness of the Agreed Order because the crux of the case was the in-person physician requirement resulting in a prohibition of medication abortion via telemedicine. Furthermore, the statute makes it clear that "[t]he provisions of any statute, so far as they are the same as those of any prior statute, shall be construed as a continuation of the prior provisions and not as a new enactment." K.S.A. 77-201 *First*.

In sum, on December 31, 2018, the district court dismissed *Trust Women I* without prejudice for failure to state a claim—the Act did not prohibit telemedicine medication abortions, so there was nothing to enjoin under the Act and K.S.A. 60-4a10 is presently

6

"barred of enforcement" and inoperative to prevent telemedicine medication abortions. The Attorney General appealed, but the case has been stayed, without briefing, for the last two years, at the request of the Attorney General.

*The Attorney General files a motion in* Hodes 2011 *to dissolve the injunction issued in 2011.*

On January 31, 2019, the Attorney General—along with the other defendants in *Hodes 2011*—filed a motion in the still-pending case to clarify or dissolve the injunction established in the Agreed Order. Presumably, this was done in response to the district court's findings in *Trust Women I* that the Agreed Order applied regardless of the 2015 amendment to K.S.A. 65-4a10 and that the Agreed Order applied to entities that were not a party to it. The defendants argued that they could not have agreed in 2011 to forgo enforcement of a statute that was amended in 2015. The district court judge, the same judge who issued the *Trust Women I* decision, held that it would adhere to its opinion in *Trust Women I*, interpreting the Agreed Order, until it heard evidence on the issues. The defendants appealed. A panel of this court dismissed the appeal for lack of jurisdiction in February 2021, holding that the district court's order did not grant, continue, modify, refuse, or dissolve the injunction created by the Agreed Order. *Hodes & Nauser v. Norman*, No. 121,046, 2021 WL 520661 (Kan. App. 2021) (unpublished opinion). No petition for review was filed. So, the Agreed Order remains in effect, the *Hodes 2011* case remains pending, and the decision to apply the Agreed Order to Trust Women on behalf of the defendants here—as determined by the judge in *Hodes 2011*—still stands.

*The present lawsuit is filed by Trust Women challenging the medication-in-person requirement of K.S.A. 65-4a10 and Sections 6 and 7 of the Telemedicine Act.*

After dismissal of its lawsuit challenging the Telemedicine Act, Trust Women filed the present lawsuit, *Trust Women II*, on January 29, 2019. It stated that it was

"bring[ing] claims on behalf of itself and its patients" and that it sought declaratory and injunctive relief. This time Trust Women challenged the medication-in-person requirement of K.S.A. 65-4a10 in addition to Sections 6 and 7 of the Telemedicine Act and included the Kansas Board of Healing Arts and Sedgwick County District Attorney Marc Bennett as defendants along with the Attorney General. It asserted that the challenged laws unduly burdened its patients' fundamental right to access abortion and violated its patients' equal protection rights by treating women seeking abortions differently than patients seeking other forms of medical care via telemedicine. Trust Women did not name or include any of its contracted physicians as parties to the lawsuit.

In the petition, Trust Women stated that it recently began providing medication abortion via telemedicine to expand access to services. Before initiating this program, Trust Women was only able to provide abortion care two days per week due to physician availability. Because the physicians did not have to travel to Wichita to perform a telemedicine medication abortion, Trust Women was able to expand its provision of the service by offering the service on additional weekdays and Saturdays. Trust Women stated that it intended to further expand access to abortion care by offering telemedicine medication abortions in the evenings and in rural locations throughout Kansas. It claimed the statutes limiting its ability to provide telemedicine medication abortions were unconstitutional.

Trust Women acknowledged that in *Trust Women I*, the district court held that enforcement of K.S.A. 65-4a10 was barred by the Agreed Order entered in *Hodes 2011*. However, Bennett and the Board of Healing Arts were not named as defendants in *Hodes 2011* or in *Trust Women I*. And, although the language of the district court's opinion in *Trust Women I* seemed clear—the Attorney General was barred from enforcing K.S.A. 65-4a10 and "any implementing regulations" and noting that a finding of unprofessional conduct by the Board of Healing Arts under K.S.A. 65-4a10 could result in criminal prosecution—Trust Women wanted assurances. Adding to its concern, in December

8

2018, Kansans for Life announced that it filed a complaint with the Board of Healing Arts asking it to investigate Trust Women's alleged provision of "'illegal'" telemedicine medication abortions. This prompted Trust Women to seek confirmation from Bennett and the Board that they would not attempt to enforce K.S.A. 65-4a10 or Section 6 of the Act. The defendants failed to provide Trust Women with written assurance that they would not enforce the challenged laws. Instead, the Attorney General immediately appealed the decision in *Trust Women I* regarding the application of the Agreed Order and also filed an action in *Hodes 2011* seeking to dissolve the now 10-year-old injunction.

In March 2019, Trust Women filed a motion for temporary injunction and a temporary restraining order enjoining the defendants from enforcing K.S.A. 65-4a10 and Sections 6 and 7 of the Telemedicine Act. The district court scheduled a hearing on the matter.

*The hearing was held, and several facts were uncontested.*

Trust Women called three witnesses at the hearing. The defendants did not present any witnesses but did establish some facts through cross-examination. The uncontested evidence presented at the hearing, pertinent to this case, was as follows.

1. Trust Women's Wichita clinic is licensed by the Kansas Department of Health and Environment as an ambulatory surgery center. The physicians who practice at Trust Women are licensed by the Board of Healing Arts, but Trust Women and its patients are not. The physicians are all independent contractors.

2. Telemedicine is used throughout the United States in practically every area of medicine—including obstetrics and gynecology—to facilitate consultations, diagnose conditions, prescribe medications, and monitor and treat chronic illness.

9

It has been used to provide medication abortion in the United States since at least 2008 and is currently being provided in Iowa, Alaska, Washington, Idaho, Nevada, Illinois, Maine, New York, Hawaii, and Oregon.

3. The Kansas Legislature has singled out one service for which telemedicine is prohibited: medication abortion. K.S.A. 65-4a10. However, for the last 10 years the Attorney General has elected not to enforce this exception.

4. Childbirth is much riskier than abortion. Similarly, the risks associated with erectile dysfunction medication like Viagra, antibiotics like penicillin, and over-the-counter drugs like Tylenol are higher than the risks associated with medication abortions. If complications do arise in a medication abortion, they occur after the patient leaves the facility, generally after she takes the second medication. While abortion is a safe and effective procedure with few serious complications, the risks of abortion increase as a pregnancy progresses.

5. Trust Women has been providing medication abortion since 2013. It began utilizing telemedicine to provide medication abortions in October 2018. Eighty-four percent of abortions performed at Trust Women in Wichita are first trimester abortions. And 60%-70% of those are medication abortions.

6. A patient is only eligible for a medication abortion for the first 10 weeks of a pregnancy, measured from the date of the last menstrual period. Medication abortions are around 95%-96% effective depending on the gestational age.

7. The procedures for medication abortions provided in-person and via telemedicine are largely the same. For both procedures, patients go to the clinic in Wichita, check in, fill out paperwork, and have lab work completed. After that, the patient is taken into an exam room where a medical staff member conducts an ultrasound.

10

For in-person medication abortions, the physician performs the ultrasound. For telemedicine procedures, the physician observes an ultrasound technician perform the ultrasound on a videoconferencing platform and reviews the results remotely. In either scenario, the physician can speak directly to the patient, view the patient's medical records, and answer any questions. Next, the physician confirms that the patient is eligible for the medication abortion.

8. Once the physician confirms that the patient wishes to proceed with a medication abortion, the patient is given the first of the two drugs—mifepristone. In a telemedicine appointment, the physician directs a medical staff member to give the mifepristone to the patient and this is visible to the physician. In an in-person appointment, the physician hands the mifepristone to the patient. The patient is provided the second drug—misoprostol—along with instructions on how to use it at home. The actual expelling of the pregnancy does not happen until the misoprostol is taken at home.

9. The patient must schedule a follow-up appointment in the Wichita clinic 14-21 days after the medication abortion, irrespective of whether the first appointment is via telemedicine or in person. At the follow-up appointment the patient is given a pregnancy test and a physician has an opportunity to evaluate the patient in person.

10. There is no statistically significant difference in patient safety between an in-person medication abortion or a telemedicine medication abortion. They are equally safe. Accordingly, there is no medical justification to require a physician to physically be in the same room with the patient when mifepristone is administered. In fact, the Federal Drug Administration no longer requires that mifepristone be administered in a clinic, medical office, or hospital, and it does not require that someone observe the ingestion of mifepristone.

11. Trust Women's Wichita clinic generally operates Monday through Friday from 8 a.m. to 5 p.m. In-person abortion services are only provided on Thursday and Friday, this is because it must schedule appointments around the availability of the two doctors with which it contracts. Finding physicians to work for Trust Women has been a consistent and chronic problem. It could perform more abortions if it could hire more physicians.

12. When Trust Women began offering telemedicine abortions in October 2018, they were able to expand the available times for medication abortions by 8-12 hours per week. They were able to offer the service on Saturdays, other weekdays, and outside of their standard business hours. While patients still had to report to the clinic, they had a much shorter wait time, usually one-and-a-half to two hours. This is because when there were only two days a week of physician availability the schedule was packed.

13. Fifty percent of Trust Women's patients live outside of Wichita.

14. The availability of telemedicine medication abortions helps patients access their preferred method of abortion because for some patients, if they were to wait for the next appointment that may be available at a site where they would see a physician in-person, they would be past the 10-week eligibility window for medication abortions, pushing them into a surgical abortion.

15. Trust Women's telemedicine medication abortion program lowered barriers to obtaining abortion by providing patients with scheduling flexibility, even if the patient still had to travel to Wichita. It also allowed the clinic to see women more quickly which reduced delays to care. This was important because the earlier an abortion can be completed the safer it is.

12

16. Trust Women stopped providing medication abortions through telemedicine on December 31, 2018.

17. Doctors will not perform medication abortions via telemedicine if it means they could lose their license.

18. One complaint was filed with the Board of Healing Arts against a physician for conducting a telemedicine medication abortion.

19. Trust Women wants to expand access to medication abortions through telemedicine into more remote or rural locations in Kansas. However, it has not taken any concrete steps to expand its telemedicine program like hiring a real estate agent, reviewing real estate listings, or visiting potential sites for a new clinic. It did not actively pursue expansion because it did not view such an option as viable given existing laws.

*The district court denies the requested relief.*

The district court ultimately denied Trust Women's request for a temporary injunction.

First, it held, as did the judge in *Trust Women I*, that Sections 6 and 7 of the Telemedicine Act do not limit or prohibit medical abortion offered via telemedicine. Trust Women does not challenge this ruling on appeal. And the defendants do not cross-appeal this ruling.

Second, it held that Trust Women lacks standing to pursue any constitutional claims against the Board of Healing Arts because the Board has no enforcement authority over Trust Women or its patients. Further, while Trust Women's contracting physicians

13

may face discipline from the Board for performing telemedicine abortions, no physicians were a party to the lawsuit. The district court also found, sua sponte, that Trust Women did not have third-party standing on behalf of its independent contractor physicians because it had "offered no proof . . . of any hindrance to the physicians' ability to protect their own interests." Regardless, Trust Women never asserted third-party standing on behalf of physicians nor do they in this appeal.

Finally, the district court denied Trust Women's request for a temporary injunction against District Attorney Bennett and Attorney General Schmidt. For the purposes of its ruling, the district court assumed that there was a substantial likelihood Trust Women would prevail on the merits. However, it held that Trust Women failed to prove it would suffer irreparable injury if the temporary injunction was not granted.

Trust Women appealed.

ANALYSIS

On appeal, Trust Women challenges the district court's refusal to grant a temporary injunction that would prohibit the defendants from enforcing K.S.A. 65-4a10. It also challenges the dismissal of the action against the Board of Healing Arts.

I.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING TRUST WOMEN'S REQUEST FOR A TEMPORARY INJUNCTION.

Trust Women first asks this court to reverse the district court's denial of its motion for a temporary injunction that would preclude the Attorney General and the Sedgwick County District Attorney from enforcing the telemedicine abortion prohibition in K.S.A. 65-4a10.

14

Appellate courts review a district court's decision on a motion for temporary injunction for abuse of discretion. The district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 619, 440 P.3d 461 (2019).

In Kansas, a party seeking a temporary injunction must show:  (1) a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability that the plaintiff will suffer irreparable injury without an injunction; (3) lack of an adequate legal remedy, such as damages; (4) the threat of injury to the plaintiff outweighs whatever harm the injunction may cause the opposing party; and (5) the injunction will not be against the public interest. 309 Kan. at 619. A temporary injunction does not determine the merits of an issue, but merely preserves the relative positions of the parties until a full decision on the merits can be made. *Steffes v. City of Lawrence*, 284 Kan. 380, 394, 160 P.3d 843 (2007).

Here, the district court first noted that section 1 of the Kansas Constitution provides a fundamental right to an abortion, a right that is to be guarded against any law that may impair it. The district court went on to assume for purposes of the action before it that Trust Women established a substantial likelihood of eventually prevailing on the merits of its constitutional challenge to K.S.A. 65-4a10. We pause to note that this finding has since been reinforced by a finding in the *Hodes 2011* case, effective January 20, 2022, that K.S.A. 65-4a10 is unconstitutional and unenforceable. The State has filed a notice of appeal in that case, but as of this writing it has not been docketed.

The district court also correctly recognized that courts presume that irreparable injury results when a constitutional right is violated. But next, it diverged from well-established Kansas caselaw. It held that it could deny the request for a temporary injunction because Trust Women failed to establish irreparable injury. Then it bolstered this conclusion by finding that Trust Women did not diligently pursue an injunction,

15

undermining any claim of irreparable injury. Both these findings resulted in an abuse of discretion, the first being an error of law and the second being an error of fact.

The Kansas Supreme Court has made it clear that a party seeking a temporary injunction need only show that "'there is a reasonable probability of irreparable future injury.'" *Board of Leavenworth County Comm'rs v. Whitson*, 281 Kan. 678, 683, 132 P.3d 920 (2006). In doing so, the Supreme Court expressly rejected any standard that is more exacting than "'reasonable probability.'" 281 Kan. at 684. A plaintiff need only show that there is a reasonable probability of irreparable injury, and "demand[ing] proof of the *certainty* of irreparable harm rather than the mere probability of it have set too high a standard for parties seeking injunctions." 281 Kan. at 684. Here, it is clear that the district court required the more exacting standard.

If it was not clear enough in *Whitson*, the Kansas Supreme Court reinforced its position in *Steffes*, 284 Kan. 380. Again, it stated that there is no requirement that a plaintiff establish that it *will suffer* irreparable injury, only that injury is reasonably probable. Citing *Whitson*, it reiterated that requiring certainty places too high of a burden on the moving party. 284 Kan. at 395. Contrary to this clear language, the district court found that Trust Women "has failed to demonstrate here that it or its patients *will suffer* irreparable injury in the absence of a temporary injunction for the period of time between now and a decision on the merits." (Emphasis added.) This is clearly the wrong legal standard. Trust Women did present evidence regarding the reasonable probability of harm related to delays in appointments forcing a patient into riskier surgical abortion procedures, length of appointments—again requiring delays if a patient could not be away from home or work that long—and cancelations due to the inability of physicians to travel. Other courts that have considered the issue have concluded that an in-person requirement results in harm and unreasonably limits a woman's access to legal abortion. *Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Medicine*, 865 N.W.2d 252, 268 (Iowa 2015) (noting the harm that results from an in-person physician requirement

16

that unreasonably limits a woman's access to legal abortion services); *Whole Woman's Health Alliance v. Rokita*, 553 F. Supp. 3d 500, 577-78 (S.D. Ind. 2021) (same), *appeal filed* August 12, 2021.

The district court also attempted to bolster its conclusion that there was no harm by holding that Trust Women's "lack of diligence in seeking an injunction undermines the notion that an injury is irreparable." Kansas courts have long held that "[c]ourts of equity require that persons shall themselves exercise reasonable diligence in the protection of their rights, and that they shall not depend slothfully upon the action of courts of equity." *Noble v. Butler*, 25 Kan. 645, 651 (1881); see also 11A Wright & Miller, Federal Practice and Procedure:  Civil § 2948.1 (2013) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

In ruling, the district court reasoned that a ban on telemedicine medication abortion has been in effect since the adoption of K.S.A. 65-4a10, in 2011. Trust Women started providing abortion services in Kansas in 2013, but didn't challenge the statute until January 2019, resulting in "a significant delay." The district court noted that Trust Women claimed there was no need to challenge the law until the Telemedicine Act went into effect. However, the district court had already found that the Telemedicine Act did not constitute a ban on telemedicine medication abortion. According to the district court's reasoning, the delay was compelling evidence that Trust Women had not suffered any irreparable harm.

A review of the record reveals additional facts that add context and justification to Trust Women's decision to bring the present lawsuit in January 2019. First, Trust Women asserts that it believed the *Hodes 2011* Agreed Order enjoined enforcement of K.S.A. 65-4a10 since December 2011. Thus, it had no reason to challenge the law when it opened its Wichita clinic in 2013. Trust Women did think that the Telemedicine Act, enacted in

17

July 2018 and effective on January 1, 2019, would prohibit the practice of providing medication abortions using telemedicine. But it acted diligently by bringing the *Trust Women I* lawsuit in November 2018 and seeking pre-enforcement relief. Thus, when Trust Women initiated its telemedicine medication abortion program in October 2018, it thought that K.S.A. 65-4a10 could not be enforced against it and it was planning to only challenge the Telemedicine Act.

Trust Women asserts that it learned for the first time during the *Trust Women I* litigation of a threat that K.S.A. 65-4a10 may be enforced against it despite the *Hodes 2011* Agreed Order. It states that "in a brief filed in *Trust Women I* on December 3, 2018, the Attorney General for the first time made the extraordinary argument that K.S.A. 65-4a10 could be enforced by himself as well as the Sedgwick County District Attorney and the Board of Healing Arts, despite the *Hodes 2011* agreed order." When the district court issued its decision in *Trust Women I* on December 31, 2018, it did not specify who was enjoined from enforcing K.S.A. 65-4a10. It simply ruled that K.S.A. 65-4a10 was "presently barred of enforcement by an *Agreed Order* of the Court in [*Hodes 2011*]." Attorney General Schmidt was the only defendant named in *Trust Women I*. Trust Women ceased its telemedicine medication abortion program the day the district court issued its decision in *Trust Women I*. Trust Women then sought written assurance from the Board of Healing Arts and the Sedgwick County District Attorney that they would not seek to enforce either K.S.A. 65-4a10 or the Telemedicine Act against Trust Women. Within a month of the *Trust Women I* decision and having received no written assurances from the Board of Healing Arts or the Sedgwick County District Attorney, Trust Women filed the present action.

The facts offered by Trust Women on this point show that it did not delay in bringing suit. Trust Women believed it was protected by the *Hodes 2011* Agreed Order, otherwise it would not have initiated the telemedicine abortion program in October 2018. Trust Women first discovered the threat of enforcement in December 2018 and filed the

18

present action less than two months later. Omitting these facts from its analysis led the district court to place undue weight on the apparent delay between the enactment of K.S.A. 65-4a10 and the initiation of the present lawsuit. This led the court to an arbitrary decision, based on incomplete facts, and that decision constitutes an abuse of discretion.

Finally, in a footnote the district court judge acknowledged the decision of her colleague enjoining enforcement of K.S.A. 65-4a10 against the defendants in *Trust Women I*. Even though accepting that decision would have been decisive, the district judge made it clear that she was not expressing an opinion on the enforceability of the Agreed Order against the defendants here. Failure to consider the impact of the Agreed Order as interpreted by the same judge that granted the injunction barring enforcement of K.S.A. 65-4a10 and while *Hodes 2011* remained pending was arbitrary and unreasonable.

The sole basis for the district court's denial of a temporary injunction in this case was Trust Women's failure to show it *will suffer* irreparable injury. That was an error of law. Basing that decision in part on Trust Women's perceived delay in bringing this action was an error of fact. And finally, failing to consider the import of the Agreed Order was arbitrary and unreasonable. Accordingly, the district court's decision denying a temporary injunction constituted an abuse of discretion. We reverse the denial of the requested relief and remand the case to the district court to apply the proper legal standard, correct its error of fact, and consider the impact of the Agreed Order.

II.    THE DISTRICT COURT ERRED WHEN IT DETERMINED THAT TRUST WOMEN DID NOT HAVE STANDING TO SUE THE BOARD OF HEALING ARTS.

Trust Women also appeals the district court's decision that it lacks standing to bring claims against the Board of Healing Arts.

19

Issues of standing present questions of law over which this court exercises unlimited review. *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 676, 359 P.3d 33 (2015).

"Kansas' standing requirement is grounded in the separation of powers doctrine which is implicit in our State Constitution." 302 Kan. at 678. Under Kansas' traditional standing test, a person must demonstrate (1) he or she suffered a cognizable injury; and (2) a causal connection between the injury and the challenged conduct. 302 Kan. at 678. The burden of establishing the elements of standing rests with the party asserting it. *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014). Each element of standing "must be proved in the same way as any other matter and with the degree of evidence required at the successive stages of the litigation." 298 Kan. at 1123. In accordance with this rule, the district court required Trust Women to establish standing by a preponderance of the evidence.

A. *Trust Women established a cognizable injury.*

The first element of standing is cognizable injury. The injury must be particularized, meaning it affects the plaintiff in a personal and individual way. It cannot be a mere generalized grievance that is a general interest common to all members of the public. An injury can be actual or threatened. 298 Kan. at 1123.

Trust Women asked the court to enjoin the Board of Healing Arts from enforcing K.S.A. 65-4a10. The statute contains a provision that says the violation of the statute constitutes unprofessional conduct as defined by the Kansas Healing Arts Act. K.S.A. 65-4a10(d). The Board is responsible for enforcing the Kansas Healing Arts Act, and thus making findings of unprofessional conduct. See K.S.A. 65-2864. If a Board licensee commits an act of unprofessional conduct, the "licensee's license may be revoked, suspended or limited, or the licensee may be publicly censured or placed under

20

probationary conditions." K.S.A. 2020 Supp. 65-2836. In addition, violation could result in prosecution for a misdemeanor offense. K.S.A. 65-2862. Trust Women is licensed by the Kansas Department of Health and Environment. While Trust Women is not licensed by the Board of Healing Arts, the physicians who practice at Trust Women are. Only physicians licensed by the Board of Healing Arts may perform abortions in Kansas. K.S.A. 65-4a10(a).

Trust Women asserts that K.S.A. 65-4a10 causes both it and its patients to suffer a cognizable injury because of "the very real threat that it could lose a physician if that physician violates K.S.A. 65-4a10 and has his or her license suspended or revoked." Losing a physician would reduce access to and delay medication abortion. It is not at all unreasonable to assume that Trust Women would not be able to hire any Kansas licensed physicians to perform telemedicine medication abortions if the licensing authority in the state found such conduct to be unprofessional and took action against their license. This injury would continue until a ruling by the court on the constitutionality of K.S.A. 65-4a10—a result the district court assumed would be favorable to Trust Women.

The district court held that Trust Women failed to establish cognizable injury for standing purposes. In ruling, the district court highlighted the fact that neither Trust Women nor its patients are licensed by the Board of Healing Arts, and thus the Board has no enforcement authority over Trust Women. The district court did consider Trust Women's argument that it suffers injury because its contracting physicians face discipline from the Board for providing telemedicine abortions in violation of K.S.A. 65-4a10. But in an exercise in circular reasoning, it rejected the contention that this injures Trust Women or its patients because "no physician is a party to this lawsuit."

But we find that a physician does not need to be a party to the lawsuit for Trust Women to have standing to sue the Board. All that is necessary is that the Board has the authority to enforce the challenged statute. *Bronson v. Swensen*, 500 F.3d 1099, 1110

21

(10th Cir. 2007) ("It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision.").

If Trust Women does not have physicians because the Board suspends or revokes the physicians' licenses for engaging in telemedicine medication abortions as prohibited by K.S.A. 65-4a10, then Trust Women cannot offer telemedicine medication abortion services. As discussed above, this particularly harms Trust Women and its patients by reducing access to and delaying abortions. Such an infringement on the constitutional right to obtain an abortion is particular to abortion providers and their patients—it is not an injury that is common to all members of the public. See *Gannon*, 298 Kan. at 1123.

Moreover, it is not necessary that the Board actually initiate disciplinary proceedings against one of Trust Women's physicians for Trust Women to demonstrate cognizable injury—the threat of enforcement is enough. The Board's ability to initiate disciplinary proceedings against a physician for unprofessional conduct, specifically the conduct proscribed by K.S.A. 65-4a10, is likely to have a deterrent effect on doctors wishing to perform telemedicine medication abortions. Dr. Colleen McNicholas, the medical director of Trust Women, testified that one of the reasons Trust Women ended its telemedicine medication abortion program was because she did not feel it was appropriate to ask physicians to risk their licenses. Further, she did not think that physicians would be willing to provide the service if they were at risk of losing their license. Such a conclusion is reasonable.

And more importantly, even though, at the time of the hearing, the Board had never taken any action against any licensee for violating K.S.A. 65-4a10, the Board refused to provide assurances to Trust Women before it filed its lawsuit that the Board would not do so while the Agreed Order was in place. In fact, it appeared to question

22

whether the Agreed Order applied to it. The Board also confirmed that a complaint had been filed against a physician working for Trust Women for providing a telemedicine medication abortion, although it could not reveal who or the results of the complaint. Counsel for the Board stated at the hearing, "[b]ut what's undisputed is okay, let's take it as a matter of fact that whatever they allege in regard to a complaint and investigation being opened is true." Accordingly, Trust Women established that the risk of enforcement and the resultant injury to it in the provision of abortion services is credible, not imaginary or speculative.

B. *Trust Women established a causal connection between the injury and the challenged conduct.*

The second part of the standing analysis requires there to be a causal connection between the injury and challenged conduct. In other words, "'the injury must be fairly traceable to the opposing party's challenged action.' [Citation omitted.]" *Gannon*, 298 Kan. at 1123. In this case, the causal connection is clear and addressed under the first factor as well. The challenged conduct that Trust Women seeks to enjoin is Board action based on K.S.A. 65-4a10(d) against physicians who provide telemedicine medication abortions. This conduct would cause the injury asserted by Trust Women: loss of physicians who could provide such abortions.

The district court ruled against Trust Women for two reasons.

First, the court relied on the fact that Trust Women is not licensed by the Board. However, Kansas courts do not require a direct relationship between a plaintiff and defendant with respect to the conduct at issue. "[T]he fairly traceable standard encompasses injury that flows indirectly from the challenged conduct." *Kansas Bldg. Industry Workers Comp. Fund*, 302 Kan. at 682. This standard does not set a very high bar. The Kansas Supreme Court has rejected the proposition that the defendant's actions

23

must be "'the very last step in the chain of causation.' [Citation omitted.]" 302 Kan. at 682. Standing can rest on the injuries produced by the statute's "coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997). Accordingly, this was not a basis for denying standing to Trust Women.

The district court also held that the timing of Trust Women's telemedicine pilot project "undermine[d] the existence of a causal connection between the challenged laws and any alleged injury to Plaintiff." Essentially, the district court held that "K.S.A. 65-4a10 was not a barrier to Plaintiff performing telemedicine abortions" because Trust Women did in fact perform such abortions between October and December of 2018. The district court relied on its finding that Trust Women only stopped performing telemedicine abortions because of the passage of the Telemedicine Act.

This finding by the district court is problematic for reasons already outlined in this opinion.

First, the finding that Trust Women *only* stopped providing telemedicine medication abortions because of the Telemedicine Act is simply not supported by the evidence before the district court. The evidence indicated several factors that converged between November 2018 when it filed *Trust Women I* and the December 31, 2018 ruling finding that Trust Women was "entitled to enjoy that umbrella of protection and safe harbor provided by the *Agreed Order*."

Although *Trust Women I* was dismissed for failure to state a claim, it was a win for Trust Women because it found that the Telemedicine Act would not be an impediment to medication abortions via telemedicine. Presumably, Trust Women would not have had to cease telemedicine abortions on December 31, 2018, if their sole concern remained the Telemedicine Act. But this victory was short-lived because a new threat was looming.

24

For the first time in seven years and after Trust Women filed its first challenge to the Telemedicine Act, the Attorney General took the position that the Agreed Order did *not* preclude him from enforcing K.S.A. 65-4a10. Again, until that point, Trust Women would not have had a claim under K.S.A. 65-4a10—because enforcement had been voluntarily suspended for the preceding seven years. In fact, it was the Attorney General, in *Trust Women I*, who threw down the gauntlet arguing that the Agreed Order did not prevent him or others—for example the Board of Healing Arts or the Sedgwick County District Attorney—from enforcing K.S.A. 65-4a10. Apparently in direct response to this argument, the district court pointed out that the Attorney General was the chief law enforcement officer in the state and was ethically bound to comply with the Agreed Order on behalf of the State, as well as pointing out that a finding of "'unprofessional conduct'" by the Board would implicate criminal sanctions enforceable by the Attorney General.

The Attorney General continued to push this position by appealing *Trust Women I* based on the language regarding the Agreed Order and by filing a motion in *Hodes 2011* to dissolve the Agreed Order. Based on the Attorney General's position in *Trust Women I* that the Agreed Order did not bind the Board of Healing Arts or the Sedgwick County District Attorney, Trust Women tried to get assurances that the Sedgwick County District Attorney and the Board of Healing Arts would recognize and comply with the Agreed Order until a decision was reached in *Hodes 2011*. Although the decision in *Trust Women I* appeared to hold that the Agreed Order applied to the Attorney General for any claims and the enforcement of any regulations related to K.S.A. 65-4a10, which would include unprofessional conduct proceedings based thereon, Trust Women indicated it did not want to do anything that would place the licensure of their physicians in jeopardy.

The CEO for Trust Women stated that she was "fearful that the clinic and our physicians could be penalized for providing telemedicine medication abortions." She testified that if weren't for this fear, Trust Women would still be providing telemedicine medication abortions. Dr. McNicholas testified there were "a number of reasons" Trust

25

Women ended its telemedicine program. Specifically, she did not want "to ask physicians to potentially put their medical license on the line when we were unclear about the impact of the current legal situation." There was no evidence that the Telemedicine Act was the sole reason Trust Women filed the present suit. Its inclusion of K.S.A. 65-4a10 in its request for an injunction demonstrates that it had new concerns about enforcement. And those concerns would prove to be well-founded.

Before the current lawsuit was filed, in December 2018, a complaint was filed with the Board against one of its physicians. So the chilling effect was no longer speculative, and the Board would not assure Trust Women that it would not take any enforcement action based on K.S.A. 65-4a10. Justifiably Trust Women returned to the court system to resolve this dispute. It stopped performing medication abortions via telemedicine but sought the temporary injunction so it could offer the telemedicine procedure while the case was pending.

Contrary to the district court's holding, the timing of Trust Women's telemedicine pilot did not undermine the existence of standing, it reinforced it. Trust Women discovered the threat of an injury that could be caused by the Board (enforcement of K.S.A. 65-4a10) in December 2018. Trust Women ceased its telemedicine program when it failed to get assurances from the Board.

Second, just because K.S.A. 65-4a10 was not enforced by the Board in the past does not mean it could not be enforced in the future. The district court cited nothing that would prevent the Board from taking action against the licenses of Trust Women's physicians, even though it assumed the challenge to the constitutionality of the statute would be successful. The district court specifically declined to address the application of the Agreed Order—which did refer to actions by the Board of Healing Arts. As discussed above, the Board's enforcement of an unconstitutional law would injure Trust Women

26

and its patients by denying them the medical professionals necessary to complete abortion procedures.

Trust Women established a cognizable injury and a causal connection between the injury and the Board of Healing Arts. For these reasons, the district court erred in holding that Trust Women did not have standing to sue the Board.

Reversed and remanded with directions.

* * *

SCHROEDER, J., dissenting: I respectfully dissent from the majority's finding that the district court abused its discretion in denying Trust Women's request for a temporary injunction. Trust Women failed to show with reasonable probability it will suffer irreparable injury without an injunction because any injury is far too speculative. Trust Women also lacked standing to sue the Board of Healing Arts as it failed to establish a cognizable injury and a causal connection between the injury and the challenged conduct.

*Temporary injunction*

Trust Women cannot support its claim that it faces a "very real threat" absent an injunction. "Mere apprehension or possibility of wrong or injury ordinarily does not establish a reasonable probability of future injury that will justify injunctive relief. [Citation omitted.]" *Sampel v. Balbernie*, 20 Kan. App. 2d 527, 531, 889 P.2d 804 (1995). Trust Women suggests the district court imposed a heightened burden by requiring a show of certainty Trust Women *will* suffer irreparable harm rather than showing a reasonable probability of irreparable harm. The district court's opinion, read as a whole, indicates the district court applied the correct standard. The district court ultimately held that Trust Women failed to meet the "reasonable probability" standard

27

because its evidence of harm was too speculative, and the evidence failed to show the challenged laws decreased access to abortion.

Trust Women asserts: "Having assumed the existence of constitutional violations, the district court should have concluded that those violations constitute irreparable future injury as a matter of law." However, constitutional violations only lead to a presumption that irreparable injury has occurred—there is no bright-line rule that mandates this finding. It is possible that a constitutional violation could give rise to an injury that is compensable "through recovery of calculable money damages," in which case "the injury is not irreparable harm justifying injunctive relief." *Persimmon Hill First Homes Ass'n v. Lonsdale*, 31 Kan. App. 2d 889, 894, 75 P.3d 278 (2003). It is also possible that a plaintiff will fail to carry its burden in showing that a future injury is more than speculative. See *Mid-America Pipeline Co. v. Wietharn*, 246 Kan. 238, 242, 787 P.2d 716 (1990) ("Mere apprehension or possibility of wrong or injury ordinarily does not warrant the granting of an injunction. [Citations omitted.]"). Trust Women's claim of harm was highly speculative and conclusory. Regardless of statutory requirements under K.S.A. 65-4a10 for telemedicine abortion, patients are still required to travel to the Wichita clinic for both the initial appointment to confirm the pregnancy before taking the medication and then return in two or three weeks to confirm the pregnancy was terminated.

A reasonable person could agree Trust Women failed to demonstrate a reasonable probability it, or its patients, would suffer irreparable injury without a preliminary injunction. Trust Women offered no evidence of any patient unable to obtain a medication abortion as a result of the ban on telemedicine abortion. In fact, Julie Burkhart, the founder and CEO of Trust Women, provided testimony establishing several reasons why a woman may be unable to obtain a medication abortion:

"So we've had patients who have called wanting to come in for an abortion, say that same week. So one, they might be so close to the gestational limit, that cutoff, that it would

28

force them into a surgical procedure. You know, sometimes if a patient calls and has to wait that 24-hour period and the doctor is only in a certain amount of time that week, that can push the patient into a surgical only procedure. So—so there have been cases where people just haven't been able to access that—their abortion of choice, which would be a medication abortion."

Notably, none of these issues are directly caused by K.S.A. 65-4a10. Dr. Colleen McNicholas gave similar testimony, explaining it was hard for her to determine whether any patients wanted a medication abortion but could not get one because of the physician in-person requirement. Dr. McNicholas stated: "There definitely are patients that wanted medication abortion but at the time of their visit were beyond the gestational age. Which, had they been offered a visit sooner, may not have been above the gestational age limit." She added that "there are lots of reasons that patients have experienced delays to care and one of them is because we are only able to offer services on certain days with limited times." It would appear this could be remedied by Trust Women contracting with more physicians for other days of the week.

Evidence showed, at best, K.S.A. 65-4a10 may make accessing medication abortion more inconvenient but did not establish the statutory requirement prevented a patient from obtaining a medication abortion. A patient's potential increased wait time for an in-person appointment is a result of Trust Women's lack of physicians or how they schedule patients, not a consequence of K.S.A. 65-4a10. Burkhart's testimony supported such proposition when she explained the times when Trust Women provides abortion care are "dependent upon the physicians coming to the clinic to provide the care," so Trust Women is "totally at the mercy of the physicians who are able to come to the facility." The district court considered the evidence and found that "the availability of telemedicine abortions has as much to do with securing resources to open new clinics and finding physicians to staff them, whether in person or remotely." Evidence showed the delay in accessing medication abortions can result from patients not realizing they are

29

pregnant until it is too late, patients not scheduling timely appointments, and the statutory waiting period. See K.S.A 65-6709(a), (b), and (d).

Mere inconvenience of obtaining a medication abortion does not necessitate a finding of irreparable injury absent an injunction. Patients are still able to exercise their constitutional right to have an abortion. In this way, K.S.A. 65-4a10 does not impair a person's right to get an abortion.

Additionally, the Attorney General entered an agreed order related to *Hodes v. Moser*, No. 2011-CV-1298 (*Hodes 2011*), agreeing the defendants would not seek to enforce K.S.A. 2011 Supp. 65-4a10, or accompanying regulations, pending the district court's final judgment. The majority points out it was well within the Attorney General's authority to enter such agreement, which was manifested by an order of the district court. *Hodes* is still pending; thus, the agreement is still in effect today. While the Attorney General has requested the district court to set aside the district court's injunctive order, the Attorney General is still bound by that agreement and order.

*Standing*

One of our first tasks on appeal is to determine if we have jurisdiction. Whether jurisdiction exists is a question of law over which our scope of review is unlimited. *Via Christi Hospitals Wichita v. Kan-Pak*, 310 Kan. 883, 889, 451 P.3d 459 (2019). One component of jurisdiction is standing. *Peterson v. Ferrell*, 302 Kan. 99, 102-03, 349 P.3d 1269 (2015). Based on the evidence before the district court, Trust Women lacked standing to sue the Board of Healing Arts as it failed to establish a cognizable injury and a causal connection between the injury and the challenged conduct. A cognizable injury must be actual or threatened and must show a "concrete likelihood of future harm." *Baker v. Hayden*, 313 Kan. 667, 680, 490 P.3d 1164 (2021). Standing cannot hinge on a conjectural injury; it must be "impending" and "probable." *Sierra Club v. Moser*, 298

30

Kan. 22, 33, 310 P.3d 360 (2013). Trust Women failed to meet this standard because its evidence of injury was far too speculative. This renders Trust Women's claim of injury conclusory and unactionable.

Burkhart testified Trust Women ended its telemedicine abortion program because she was "fearful that the clinic and our physicians could be penalized." But Burkhart never provided any additional evidence on whether the Board threatened to act against Trust Women's physicians. Dr. McNicholas did not testify in a capacity in which she could lose her medical license for performing telemedicine abortions. There also was no evidence such a threat was real or imminent. While the district court found evidence of a complaint filed with the Board about Trust Women providing telemedicine abortions, there was no evidence the Board had opened an investigation into any of Trust Women's physicians or taken action against their licenses. Further, the Board defendants know Trust Women's physicians operated in violation of K.S.A. 65-4a10 because they are a party to this lawsuit, yet there was no evidence the Board investigated or sanctioned any of Trust Women's independent contracting physicians. It appears those physicians continue to provide in person abortion services for Trust Women.

The majority reasons Trust Women, while not licensed by the Board, contracts with physicians who are licensed by the Board to perform abortions in Kansas. Therefore, both Trust Women and its patients suffer a cognizable injury because of "the very real threat that it could lose a physician if that physician violates K.S.A. 65-4a10 and has his or her license suspended or revoked." Slip op. at 21. Losing a physician could potentially reduce access to and delay medication abortions, but any particularized injury is attributable to the physicians who are not parties to this suit. The physicians are subject to discipline by the Board, not Trust Women or its patients. The district court was correct in noting the Board has no authority over Trust Women because neither Trust Women nor its patients are licensed by the Board.

31

The absence of Trust Women's physicians in this lawsuit precludes Trust Women from establishing standing. The Board cannot act directly against Trust Women, and the physicians providing services for Trust Women are not employees but independent contractors. In fact, Trust Women consistently refers to the physicians as independent contractors rather than employees.

There appears to be little caselaw directly addressing an employer's standing on behalf of an independent contractor; caselaw on this subject largely arises from workers compensation and medical malpractice litigation. The employment relationship between that of an employer-employee and that of an employer-independent contractor differs. The criteria to determine what type of employment relationship exists "'vary under different contexts. . . . [T]here is no absolute rule for determining whether an individual is an independent contractor or an employee.' [Citation omitted.]" *Nash v. Blatchford*, 56 Kan. App. 2d 592, 598, 435 P.3d 562 (2019).

> "Kansas courts, however, have consistently defined an independent contractor as 'one who, in exercising an independent employment, contracts to do certain work according to his or her own methods, without being subject to the control of the employer, except as to the results or product of his or her work. The primary test used by the courts . . . is whether the employer has the right of control and supervision over the work of the alleged employee and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor. An independent contractor is one who, in the exercise of an independent employment, contracts to do a piece of work according to his own methods and who is subject to his employer's control only as to the end product or final result of his work.' [Citations omitted.]" 56 Kan. App. 2d at 600-01.

Generally, the employer of an independent contractor, absent an act of negligence on the employer's part, is not liable for the independent contractor's negligence or

32

improper execution of the work. *Dillard v. Strecker*, 18 Kan. App. 2d 899, 906, 861 P.2d 1372 (1993). However,

> "'An exception to the general rule is the inherently dangerous activity doctrine, which provides that one who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such dangers.'" 18 Kan. App. 2d at 906 (quoting *Balagna v. Shawnee County*, 233 Kan. 1068, Syl. ¶ 4, 668 P.2d 157 [1983]).

The parties do not distinguish between an employer-employee relationship or an employer-independent contractor relationship as it relates to Trust Women and the physicians. The facts are limited as to the type of employment relationship that existed between Trust Women and its physicians as the parties did not focus on or raise the issue below. Not only does Trust Women consider the physicians independent contractors, but what facts we do have also suggest Trust Women lacks control over the physicians who maintain a high level of independence.

There are numerous factors the court looks at to determine, under the totality of the circumstances, whether a worker is an employee or an independent contractor. The parties seem to agree the physicians are independent contractors but do not appreciate that such relationship further affects Trust Women's standing to bring this suit without naming the physicians as parties. Moreover, the physicians did not testify in this matter. Trust Women not only failed to establish a cognizable injury, but also failed to show a causal connection between the injury and the challenged conduct. Trust Women's speculative future injury is insufficient to establish the cognizable injury element of standing. Even if Trust Women had standing in this matter, there must be more than a mere possibility that the alleged injury will occur. Based on the record, any finding that

33

the Board defendants' ability to enforce K.S.A. 65-4a10 threatens Trust Women would be based purely on speculation.

For these reasons, I would find the district court did not abuse its discretion in denying Trust Women's request for a temporary injunction and would affirm the district court's finding that Trust Women lacked standing to sue the Board because it did not suffer a cognizable injury and failed to establish a causal connection between the injury and the challenged conduct.