IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,378

LEAGUE OF WOMEN VOTERS OF KANSAS, LOUD LIGHT, KANSAS APPLESEED CENTER FOR
LAW AND JUSTICE, INC., and TOPEKA INDEPENDENT LIVING RESOURCE CENTER,
*Appellants,*

v.

SCOTT SCHWAB, in His Official Capacity as Kansas Secretary of State, and KRIS W.
KOBACH, in His Official Capacity as Kansas Attorney General,
*Appellees.*

SYLLABUS BY THE COURT

1.

Under Kansas' traditional, two-part standing test, a party must demonstrate they have suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct. A party establishes a cognizable injury—i.e., an injury in fact—when they suffer some actual or threatened injury as a result of the challenged conduct.

2.

An allegation of future injury can satisfy the injury-in-fact component in a pre-enforcement challenge if there is a threatened impending, probable injury. Plaintiffs need not expose themselves to liability or prosecution before suing to challenge the basis for the threat. Rather, plaintiffs can satisfy the injury-in-fact component when they allege an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.

1

3.

The State may validly regulate the content of speech based on content that is not constitutionally protected, such as obscenity, incitement, defamation, fighting words, speech integral to criminal conduct, true threats, speech presenting some grave and imminent threat the government has the power to prevent, child pornography, and fraud.

4.

When the Legislature criminalizes speech and does not—within the elements of the crime—provide a high degree of specificity and clarity demonstrating that the only speech being criminalized is constitutionally unprotected speech, the law is sufficiently unclear to confer pre-enforcement standing on a plaintiff challenging the law.

Review of the judgment of the Court of Appeals in 62 Kan. App. 2d 310, 513 P.3d 1222 (2022). Appeal from Shawnee District Court; TERESA WATSON, judge. Oral argument held February 1, 2023. Opinion filed December 15, 2023. Judgment of the Court of Appeals dismissing the appeal is vacated, and the case is remanded to the Court of Appeals.

*Elisabeth C. Frost*, pro hac vice, of Elias Law Group LLP, of Washington, D.C., argued the cause, and *Henry J. Brewster*, pro hac vice, *Tyler L. Bishop*, pro hac vice, *Justin Baxenberg*, pro hac vice, *Mollie A. DiBrell*, pro hac vice, *Richard A. Medina*, pro hac vice, *Marisa O'Gara*, pro hac vice, and *Spencer M. McCandless*, pro hac vice, of the same firm, *David Anstaett*, pro hac vice, of Perkins Coie LLP, of Madison, Wisconsin, and *Pedro L. Irigonegaray*, *Jason Zavadil*, *Nicole Revenaugh*, and *J. Bo Turney*, of Irigonegaray, Turney & Revenaugh LLP, of Topeka, were with her on the briefs for appellants.

*Bradley J Schlozman*, of Hinkle Law Firm LLC, of Wichita, argued the cause, and *Scott R. Schillings*, of the same firm, *Brant M. Laue*, former solicitor general, *Anthony J. Powell*, solicitor general, and *Derek Schmidt*, former attorney general, and *Kris W. Kobach*, attorney general, were with him on the briefs for appellees.

2

The opinion of the court was delivered by

STEGALL, J.: The appellants—four non-profit groups aimed at maximizing political engagement in Kansas—sought a temporary injunction against K.S.A. 25-2438(a)(2)-(3), which makes it a severity level 7, nonperson felony to engage in "conduct that gives the appearance of being an election official" or conduct that "would cause another person to believe a person engaging in such conduct is an election official." Appellants contend the statute is overbroad, unconstitutionally vague, and results in the criminalization of their voter education and registration activities. To support their claims, they have asserted that during past events, observers at times believed they were election officials even though they always take measures to clearly identify themselves as private citizens. The State contends appellants' fear of prosecution is unfounded because the statute criminalizes only "knowingly" misleading someone into thinking one is an election official. No actual prosecutions have commenced against appellants.

The district court denied appellants' request for a temporary injunction after finding they could not establish a substantial likelihood of eventually prevailing on the merits. A split panel of the Court of Appeals dismissed appellants' claims for lack of standing, finding appellants failed to satisfy their burden to demonstrate an injury-in-fact because they are not at risk of prosecution under the statute. We granted appellants' petition for review. Today we hold that when the Legislature criminalizes speech and does not—within the elements of the crime—provide a high degree of specificity and clarity demonstrating that the only speech being criminalized is constitutionally unprotected speech, the law is sufficiently unclear to confer pre-enforcement standing on a plaintiff challenging the law. Such is the case with the statute at issue here.

3

In 2021 the Kansas Legislature enacted House Bill 2183 which reads in relevant part:

> "(a) False representation of an election official is knowingly engaging in any of the following conduct by phone, mail, email, website or other online activity or by any other means of communication while not holding a position as an election official:
>
> (1) Representing oneself as an election official;
>
> (2) engaging in conduct that gives the appearance of being an election official; or
>
> (3) engaging in conduct that would cause another person to believe a person engaging in such conduct is an election official." L. 2021, ch. 96, §3 (codified at K.S.A. 25-2438[a]).

Governor Laura Kelly vetoed the bill on April 23, 2021. The Legislature voted to override the Governor's veto, and the statute took effect on July 1, 2021.

The appellants—League of Women Voters of Kansas, Loud Light, Kansas Appleseed Center for Law and Justice, Inc., and Topeka Independent Living Resource Center—quickly challenged the new law. They sought a temporary injunction against subsections (a)(2) and (a)(3), claiming these provisions contravene their rights to free speech and association in violation of sections 3 and 11 of the Kansas Constitution Bill of Rights, are overbroad, and are unconstitutionally vague in violation of section 10.

Appellants maintain that (a)(2) and (a)(3) "turn on how conduct is *perceived*, rather than the actor's intent (or lack thereof) to create that perception." Appellants argued

before the district court that although they always overtly identify themselves as volunteers from their respective organizations, given the nature of their work, individuals easily can—and often do—mistake them for county election officials.

Appellants submitted several affidavits in support of their claims. Ami Hyten, executive director of appellant Topeka Independent Living Resource Center, provided an example of one of the Center's recent voter engagement plans where the Center had generated an area mailing list of individuals who were not registered to vote, sent letters with voting information and official registration forms to those individuals, and then followed up by phone to offer support with the registration process or casting their ballot. Hyten expressed concern that if the Center continues to engage in these kind of activities—which involves "reproducing official state documents for the individuals [the Center] serve[s]"—the Center's volunteers risk prosecution under the new law, because "[a]s anyone who has worked on voter education activities long enough knows, voters may innocently mistake people who conduct the work we conduct as election officials."

Several of the other individuals who submitted affidavits reflected this concern—as individuals experienced in conducting voter engagement activities, they personally have experienced citizens mistaking them for elections officials. Davis Hammet, president and executive director of appellant Loud Light, described several of Loud Light's activities, which include running young voter registration drives, creating multi-media content about how to participate in elections, giving classroom presentations, and sending educational mailers to voters. In addition, Loud Light organizes ballot cure programs where it contacts voters whose ballots are challenged by county election officers—with a specific focus on voters who election officials had been unable to contact—for things like mismatched signatures, and educates the voters on how to cure their ballots. Hammet expressed concern about the new law because he personally has been mistaken for an election official in the past, "because voters innocently mistake people who are knowledgeable about voter registration and election procedures as

5

election officials." Hammet described one such event that occurred while canvassing in Pittsburg, Kansas. At the event, the Crawford County Board of Elections had a voter registration booth next to another booth with an organization also conducting voter registration, and Loud Light volunteers were also present walking through the crowd registering voters near those booths. Hammet described how many individuals he interacted with during the event asked whether he was with the county election office. He always clarified that he was not, but asserted that "had they never asked, [he was] not certain they would have ever reached the correct conclusion."

Hammet further described how Loud Light often receives supplies from the Shawnee County Board of Elections to help in their voter registration drives. These supplies include voter registration forms, banners advertising voter registration materials, and other materials to help facilitate the events, which Loud Light utilizes alongside their own supplies. Hammet fears that continuing to use these supplies could leave an impression with voters that these drives are run by the local county board, but that discontinuing use of these supplies would make their drives less effective.

Jacqueline Lightcap, co-president of appellant League of Women Voters of Kansas, also described the various events the Kansas League puts on throughout the year, including at local high schools and community colleges, local libraries, public housing offices, YMCAs, local utility offices, and state and county fairs. Lightcap highlighted a handful of specific events, including describing a booth set up by the Wichita-Metro League at the annual Wichita Riverfest. The booth—located directly next to the Sedgwick County Election's Office booth—was decorated with banners and signs encouraging individuals to register to vote. Lightcap's affidavit asserted that while the Sedgwick County booth displayed its voting machines, it did not register individuals to vote; that task was delegated solely to the Wichita-Metro League. Lightcap further stated that the Metro League members were often intermingled and talking with the local elections staff during the festival. The proximity of the booths, as well as the friendliness

6

between the volunteers at each booth, could cause a person strolling by during the busy festival to have easily mistaken the two booths for one another or perceive it as one large installation from the local board, according to Lightcap.

Lightcap expressed additional concerns about the Kansas League's current practice of relying on and promoting websites and information put together by Kansas local and state elections officials. Given the Kansas League's wide reach—for example, in 2020, the Kansas League coordinated 354 total election-related activities which yielded 7,766 unique voter contacts and registered over 2,000 voters—Lightcap expressed concern that inevitably some individuals may think Kansas League volunteers were affiliated with the local elections office.

Jamie Shew, Douglas County clerk, asserted that despite Douglas County's large size, the clerk's office has just three full-time and one part-time staff that work on the administration of elections. Their small size requires them to rely on outside groups to conduct nearly all voter registration drives. To that end, Shew stated that he has worked with the Douglas County chapter of the Kansas League for years. Shew specified that to assist the League in conducting voter registration drives, his office often provides them with materials—which are typically marked with the Douglas County Clerk's Office emblem—such as signs, banners, and leaflets advertising the drives. Shew has also collaborated with the Douglas County League at other events, noting as one example that he has spoken at several informational sessions sponsored by the Douglas County League about upcoming elections. Shew stated that if his office receives a request to set up a voter registration drive at an event, he refers the request directly to the Douglas County League, as he knows from experience that they are "extremely knowledgeable and professional," and by relying on the League and other similar groups his office can fulfill outreach and registration functions he otherwise would not have the resources to fulfill.

Caleb Smith, the integrated voter engagement director of appellant Kansas Appleseed, stated that Appleseed also conducts many voter education and engagement activities, including door-to-door canvassing and registering citizens to vote, tabling and engaging with voters at local fairs, art festivals, and other large gatherings, and assisting voters in remote and rural areas with returning their completed advance voting ballots to county election offices. Smith asserted that text messages sent out from Kansas Appleseed volunteers—and clearly identified as such—contained links to official websites managed by the Kansas Secretary of State. His work in conducting these kinds of activities has caused citizens to ask Smith and his volunteers whether they were with the local county elections board. He stated that while he and his volunteers always correctly identify themselves, "this confusion persists in our communities. At any given event, citizens will ask if Kansas Appleseed volunteers are affiliated with the local elections boards."

Once the new statute went into effect, appellants claimed that due to these concerns, they cancelled and curtailed many of their planned voter events because they believe the statute places "at risk of prosecution anyone who engages in conduct that they reasonably know *could* give another person the impression that they are an election official." Appellants contend that based on the above facts, their voter engagement events may cause inadvertent misimpressions among members of the public—despite their best efforts to clearly identify themselves—which places them at risk of felony prosecution under the new law.

The district court denied appellants' request for a temporary injunction. The court reasoned that a successful prosecution under K.S.A. 25-2438(a)(2)-(3) would require "that the *actor*—not the bystander—be reasonably certain that what he or she is doing gives the appearance of or causes another person to believe that he or she" is an election official. The court also disposed of appellants' overbreadth claim because "protected

8

activity is not the law's target at all." Finally, the court reasoned that the statute "does not focus entirely on subjective perceptions," as it "focuses on the culpable mental state of the actor, not the subjective impression of a bystander."

The district court concluded appellants failed to demonstrate "a substantial likelihood of eventually prevailing on the merits of their Section 11 challenge" which proved "fatal" to their request for a temporary injunction. As a result, the court declined to examine the other necessary components for a grant of temporary injunction. The court also recognized that though the State claimed appellants lacked standing to pursue their claims, it would not address the standing arguments in its order because it was denying the motion "on another basis." These aspects of the district court's decision are not before us in this appeal, and we express no opinion on them. Our review is strictly limited to the subsequent Court of Appeals' ruling on standing.

In fact, the district court's refusal to address the parties' standing arguments drew criticism from the Court of Appeals, which quipped that the district court "'put the merits cart before the standing horse.'" *League of Women Voters of Kansas v. Schwab*, 62 Kan. App. 2d 310, 317, 513 P.3d 1222 (2022). The panel accordingly began its analysis by evaluating appellants' standing.

The Court of Appeals found that because "appellants' conduct does not involve deceptive practices but is properly characterized as reasonable efforts to foster discourse and facilitate the exchange of ideas," their activities "lack the nefarious or deceptive qualities K.S.A. 2021 Supp. 25-2438 is designed to combat, placing the appellants beyond its reach." 62 Kan. App. 2d at 321-22. The panel concluded that appellants lacked standing to challenge K.S.A. 25-2438(a) because they could not establish a cognizable injury. Specifically, appellants failed to take the necessary steps to mount a pre-

9

enforcement challenge because they could not show that their conduct was proscribed by the statute or that they were under a credible threat of prosecution. 62 Kan. App. 2d at 322, 328.

Judge Hill dissented, writing that the majority would require appellants to be arrested, charged, tried, and convicted before the statute could be challenged, and criticized the majority opinion as being broad enough to do away with the possibility of a pre-enforcement challenge. 62 Kan. App. 2d at 332-40 (Hill, J., dissenting).

We granted appellants' petition for review on the question of standing.

DISCUSSION

Parties in a judicial action must have standing as part of the Kansas case-or-controversy requirement imposed by the Judicial Power Clause of Article 3, § 1 of the Kansas Constitution. The effect of this requirement is that standing is a component of subject matter jurisdiction, which any party, or the court on its own motion, may raise at any time. *Sierra Club v. Moser*, 298 Kan. 22, 29, 310 P.3d 360 (2013). Plaintiffs must establish that they have standing to raise the claims before they can proceed. *Baker v. Hayden*, 313 Kan. 667, Syl. ¶ 4, 490 P.3d 1164 (2021).

The test for standing in Kansas differs from the federal standard. See *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 679-80, 359 P.3d 33 (2015) ("Given the differences in the genesis of the two systems, we do not feel compelled to abandon our traditional two-part analysis as the definitive test for standing in our state courts."). Under Kansas' traditional, two-part standing test, a party must demonstrate they have "suffered a cognizable injury" and that there is "a causal connection between the injury and the challenged conduct." *State v. Bodine*, 313 Kan. 378, 385, 486 P.3d 551 (2021).

10

A party establishes a cognizable injury—i.e., an injury-in-fact—when they "'suffer[] some actual or threatened injury as a result of the challenged conduct.'" *State v. Stoll*, 312 Kan. 726, 734, 480 P.3d 158 (2021). The injury must pose "'adverse legal interests that are immediate, real, and amenable to conclusive relief.'" *Kansas Bldg. Industry Workers Comp. Fund*, 302 Kan. at 678. An allegation of future injury can satisfy the injury in fact component of the standing inquiry if there is a threatened "impending, probable injury," as a plaintiff is not required to "expose himself to liability before bringing suit to challenge the basis for the threat." *Sierra Club*, 298 Kan. at 33; *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007); see also *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014) ("When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.").

The United States Supreme Court has referred to this as a "pre-enforcement" challenge and has held that a plaintiff satisfies the injury-in-fact component in such a challenge when they allege "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" 573 U.S. at 159. A high threshold is required to demonstrate standing on a pre-enforcement challenge. The challenger must show an imminent threat of prosecution that is not speculative or imaginary. 573 U.S. at 160.

Importantly, when evaluating whether a plaintiff has satisfied the injury-in-fact component, we "accept the facts alleged in the petition as true, along with any inferences that can be reasonably drawn therefrom." *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 751, 189 P.3d 494 (2008); see also *Steckline Communications, Inc. v. Journal Broadcast Group of KS, Inc.*, 305 Kan. 761, 766-67, 388 P.3d 84 (2017) (evaluating whether plaintiff had "alleged sufficient facts which, if true, would establish

11

its standing to pursue the claims it asserts"). We note here that appellants have provided a robust factual record which, at this stage of the proceedings and for the purposes of our standing analysis, we accept as true.

Appellants also allege standing under our established "overbreadth" exception to traditional standing requirements. In such cases, a plaintiff "need not establish a personal injury arising from that law." *City of Wichita v. Trotter*, 316 Kan. 310, 312, 514 P.3d 1050 (2022). It is enough that the challenger alleges "'the mere existence of the statute could cause a person not before the Court to refrain from engaging in constitutionally protected speech or expression.'" *State v. Williams*, 299 Kan. 911, 919, 329 P.3d 400 (2014). But because we hold appellants have established standing under our pre-enforcement rules, we need not address the parties' arguments concerning standing under our overbreadth exception.

Whether a party has standing is a question of law subject to unlimited review. *Sierra Club*, 298 Kan. at 29. To the extent the standing question requires us to engage in statutory interpretation, we likewise exercise unlimited review. This means we "give no deference to the district court's or the Court of Appeals' interpretation of the statute." *Jarvis v. Kansas Dept. of Revenue*, 312 Kan. 156, 159, 473 P.3d 869 (2020).

When a statute is plain and unambiguous, we must give effect to the intention of the Legislature as expressed, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, we will not "'speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute.'" *Roe v. Phillips County Hospital*, 317 Kan. 1, 5, 522 P.3d 277 (2023).

As already discussed, the Court of Appeals held the nonprofits could not establish standing because they faced no credible threat of prosecution. To evaluate that holding, we must first articulate the potentially protected nature of the speech regulated by the statute. And as a further housekeeping note, we recognize that appellants' challenge arises under our state Constitution. But we have previously recognized that the First Amendment and section 11 protections are generally considered coextensive. *State v. Russell*, 227 Kan. 897, 899, 610 P.2d 1122 (1980). Though appellants argue our recent caselaw indicates the Kansas Constitution provides even broader protection than the federal Constitution (and the language of section 11 may support that claim), we need not explore that argument here as even under traditional First Amendment jurisprudence we conclude that appellants have standing to challenge the law.

The government may impose two types of restrictions on protected speech. First, it may make reasonable restrictions on the time, place, or manner of content-neutral protected speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989). The provisions at issue here are not time, place, or manner restrictions. Second, the state may regulate the content of speech if it does so within strict constitutional boundaries. Content-based restrictions are identified by examining if the law "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015). Content-based regulations of speech are generally subject to strict scrutiny unless the speech at issue falls within a narrowly defined category of constitutionally unprotected speech. 576 U.S. at 163-64; *United States v. Alvarez*, 567 U.S. 709, 717, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012). Constitutionally unprotected speech may be freely restricted by the state so long as the regulations fall within the scope of its police power:

> "'From 1791 to the present,' . . . the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these traditional limitations.' These 'historic and traditional categories long

13

familiar to the bar,'—including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—are 'well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.' [Citations omitted.]" *United States v. Stevens*, 559 U.S. 460, 468-69, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010).

These historic and traditional categories—as well as fighting words, true threats, and "speech presenting some grave and imminent threat the Government has the power to prevent"—all "have a historical foundation in the Court's free speech tradition" and thus fall outside of First Amendment protection. *Alvarez*, 567 U.S. at 717-18. Outside of these limited historic categories, the Court has expressed reluctance to recognize new categories of unprotected speech; for example, it has declined to recognize flag burning, outrageous and intentional infliction of emotional distress, vice and temperance, or dog fighting videos as categories of unprotected speech. See *United States v. Eichman*, 496 U.S. 310, 315-18, 110 S. Ct. 2404, 110 L. Ed. 2d 287 (1990) (flag burning); *Snyder v. Phelps*, 562 U.S. 443, 457-58, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) (outrageous and intentional infliction of emotional distress); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 514, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996) (plurality opinion) (vice); *Stevens*, 559 U.S. at 481-82 (dog fighting). One of the only new categories of unprotected speech recognized by the Court is child pornography, *New York v. Ferber*, 458 U.S. 747, 758, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982), but the Court made clear that child pornography represented a "special case" as "'[t]he market for child pornography was 'intrinsically related' to the underlying abuse, and was therefore 'an integral part of the production of such materials, an activity illegal throughout the Nation.'" *Stevens*, 559 U.S. at 471-72. It emphasized, however, that it was not "establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment." 559 U.S. at 472.

As already noted, fraud is one category of speech that is well-established as being beyond the scope of First Amendment protection. See, e.g., *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 771, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) ("[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues.").

The parties do not dispute that K.S.A. 25-2438(a) is a content-based restriction that *attempts* to prohibit a type of fraud—which, as a historically recognized category of unprotected speech, the government may legitimately restrict without running afoul of the First Amendment. The dispute is focused on whether the plain language of the statute actually does this. The State and both courts below conclude that it does by saying— albeit in different ways—that the statute does not regulate the protected activities of appellants. The nonprofit groups, meanwhile, are not consoled and continue to insist that the plain language of the statute sweeps more broadly than simply unprotected fraudulent speech and catches in its dragnet protected speech such as their voter registration drives.

The factual record—which again, we must accept as true at this point in the lawsuit—helpfully narrows the focus of the dispute to one sharp point. Namely, the appellants complain about the problem of what they describe as the "innocent listener mistake." Appellants argue that subsections (a)(2) and (a)(3) of the statute impose criminal liability in the case of the innocent listener mistake, but that such a scenario does not involve unprotected speech.

The actus reus of the two challenged subsections—that is, the verbs—are to "give[] [an] appearance" and to "cause [a] person to believe." The necessarily subjective and interpretive process inherent in these verbs are what disturb the nonprofits and

15

allegedly chill their constitutionally protected activities. The State (and the lower courts) contend that the mens rea of "knowingly" in K.S.A. 25-2438(a) effectively side-steps the innocent listener mistake. See *League of Women Voters of Kansas*, 62 Kan. App. 2d at 322 ("[T]he activities at issue lack the nefarious or deceptive qualities K.S.A. 2021 Supp. 25-2438 is designed to combat, placing the appellants beyond its reach."); District Court Memorandum Decision and Order ("The statute requires a culpable state of mind on the part of the actor; there is no violation based solely on the subjective perception of a bystander."); Appellee's Brief, at 35 ("Plaintiffs['] . . . contention [that the statute focuses entirely on others' subjective perceptions] is inconsistent with the statutory text, as informed by the canons of statutory construction and fundamental principles relating to criminal statutes' *mens rea* requirements. The statute's prohibitions target only the conduct of the *speaker*, not the subjective views of the *listener*. The statute's reach is likewise limited to actions by the speaker in which he/she *knowingly* engaged in actions designed to convey the false impression that he/she is an election official.").

But again, the nonprofits are not consoled. They argue persuasively that based on their experience, they "know" that a certain percentage of the people they encounter will make the innocent listener mistake. To demonstrate their credible fear of prosecution under (a)(2) or (a)(3), volunteers with appellants' organizations submitted affidavits, as described above, asserting that while helping people register to vote during voter registration drives, citizens have approached them and asked whether the volunteers were with the local county elections board. As such, there exists a factual basis for the proposition that appellants "know" their protected speech will generate some innocent or unreasonable listener mistakes. And they ask, how can the known possibility of an innocent or unreasonable listener mistake alter the fundamental nature of the speech from protected to unprotected? Put another way, can a listener's mistake—whether innocent or in fact entirely unreasonable—turn otherwise honest speech into fraud?

16

The answer must be no. But why? Because, in this context, in order to fall outside constitutional protections, the speech at issue must be deceptive, fraudulent, or otherwise false, at its heart. See, e.g., K.S.A. 2022 Supp. 21-5917 (criminalizing the "impersonation [of] . . . a public officer . . . with knowledge that such representation is false"). The particular mens rea required in order to establish the requisite gravamen of falsity or fraud may be intentional, knowing, or even reckless. See *Counterman v. Colorado*, 600 U.S. 66, 78-79, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023); see also *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750-51, 143 S. Ct. 1391, 216 L. Ed. 2d 1 (2023). But fraud or deception cannot arise out of a true listener mistake. See, e.g., *Griffith v. Byers Construction Co.*, 212 Kan. 65, 73, 510 P.2d 198 (1973) (defining fraud to include an element of "reasonable" reliance on the part of the listener).

Human language and the complexities of speech—through words, behavior, dress, mannerisms, gestures, facial expressions, etc.—are infinitely varied and not amenable to a rigorous, mathematical, inputs-equal-outputs kind of analysis. See Drew, 12 Types of Communication, https://helpfulprofessor.com/types-of-communication/ (describing nonverbal, verbal, visual, written, intrapersonal, interpersonal, mass, synchronous, asynchronous, formal, informal, and metacommunication); Ford, Body Language and Behavioral Profiling 4 (2010) ("The *Oxford English Dictionary* collectively contains over a half-million words; however, . . . the everyday vocabulary of most Americans seldom consists of more than two to three thousand words which they use repeatedly. . . . Humans, however, are extremely clever in devising wonderful nonverbal techniques . . . . Everyone, to one degree or another, has a personal array of nonverbal skills that express their innermost attitudes, feelings, and beliefs in ways that other people quickly and clearly understand."); Pease & Pease, The Definitive Book of Body Language:  The Hidden Meaning Behind People's Gestures and Expressions 8 (2008) (our spoken language acknowledges how important body language is to communication as evidenced by common phrases like "get it off your chest"; "keep a stiff upper lip"; "stay at arm's length"; "keep your chin up"; "put your best foot forward"; and that's "hard to swallow").

Speech—that is, human communication—is a two-way street. But sometimes a listener may mistake the meaning intended by the speaker. This may be due to the imprecision of the speech itself. It may also arise from the unfamiliarity of the listener with the particular language, dialect, or culture and idioms of the speaker. Mistakes also at times result from just plain old unreasonableness or willfulness on the part of the listener.

Despite these "problems" with speech, however, it remains the cornerstone of our free society and undoubtedly an essential, fundamental principle of American government. See, e.g., *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002) ("The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought."); *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 161, 60 S. Ct. 146, 84 L. Ed. 155 (1939) (the right to speech is "vital to the maintenance of democratic institutions").

Indeed, the framers knew that "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," and that all discussion would be futile without the freedom of speech. *Whitney v. California*, 274 U.S. 357, 375, 47 S. Ct. 641, 71 L. Ed. 1095 (1927), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969); see also *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (acknowledging the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

Nonetheless, we note the reality of declining respect—in many quarters and across the political spectrum—for the open and free exchange of ideas and engagement in the

political process. Efforts to curb speech protections extend beyond speech that is widely condemned—such as hate speech—and have come to include more amorphous categories labeling contested speech as false.

Legal scholars have explored various means of either regulating or punishing allegedly false speech occurring in the political arena. Some propose banning political speech that is "misleading or factually incorrect. The European Union, and in particular Germany, has begun heading down this avenue with significant fines for failure to remove false or misleading content upon notice to do so." This approach may involve requiring "pre-approval before publication" or "content that is flagged as potentially false could be investigated and then ordered removed if falsity is confirmed." Barrett, *Free Speech Has Gotten Very Expensive: Rethinking Political Speech Regulation in A Post-Truth World*, 94 St. John's L. Rev. 615, 650 (2020).

So we are cognizant—and wary—of recent government efforts to expand the scope of fraudulent speech to include speech the government, in its judgment, determines is simply false or misleading in some fashion. As one commentator has put it, the Constitution requires "breathing space" safeguards when the government attempts to regulate "false statements that occur within election speech." Jacobs, *Freedom of Speech and Regulation of Fake News*, 70 Am. J. Comparative L. i278, i292 (2022). In this environment, we understand why the nonprofits may legitimately fear even a good-faith effort to initiate prosecution arising out of the innocent listener mistakes that could flow from their voluntary election activities.

With this backdrop, we can ask and answer the precise question presented—is there actually a credible threat of prosecution under K.S.A. 25-2438(a)(2)-(3) in the case of an innocent or unreasonable listener mistake? Given the plain language of the statute,

19

we think the answer must be yes. The statute simply does not provide clarity that truthful speech which generates an innocent or unreasonable listener mistake is outside of its scope. And this is sufficient to confer pre-enforcement standing.

Thus, when the Legislature criminalizes speech and does not—within the elements and definitions of the crime—provide a high degree of specificity and clarity demonstrating that the only speech being criminalized is constitutionally unprotected speech, the law is sufficiently unclear to confer pre-enforcement standing on a plaintiff challenging the law. As such, and accepting appellants' well-pled facts as true, we conclude appellants have standing to pursue their challenge of K.S.A. 25-2438(a)(2)-(3). We caution, however, that our holding today does not pronounce any definitive interpretation or construction of K.S.A. 25-2438(a). We limit today's opinion to the broader question of standing.

The Court of Appeals erred in dismissing appellants' claims for lack of standing. Accordingly, we vacate the Court of Appeals' opinion and remand this matter to the Court of Appeals for further proceedings.

BILES, J., not participating.

ROSEN and STANDRIDGE, JJ., concur in the result only.